IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| r | : |
| | : |
| v. | : |
| | : |
| DAVID L. WINN, | : |
| Respondent | : |

**04-40075**

MEMORANDUM OF LAW

NOW COMES Petitioner, David Sloane, pro se, and in support of his
PETITION FOR WRIT OF HABEAS CORPUS UNDER TITLE 28 U.S.C. § 2241
AND/OR WRIT IN THE NATURE OF MANDAMUS UNDER TITLE 28 U.S.C.
§§ 1361 AND 1651, respectfully submits this MEMORANDUM OF LAW.

## TABLE OF CONTENTS

| | |
|---|---|
| TABLE OF AUTHORITIES | ii |
| FACTUAL HISTORY | 1 |
| QUESTIONS PRESENTED | 4 |
| ARGUMENTS | 5 |
| I. Appropriateness of § 2241 | 5 |
| II. Exhaustion of administrative remedies | 7 |
| III. Calculation of Good Conduct Time Credit | 10 |
| IV. Calculation of Pre-release Preparation Date | 22 |
| V. Authority of Court to provide relief | 26 |
| RELIEF SOUGHT | 27 |
| CONCLUSION | 29 |

TABLE OF AUTHORITIES

Statutes

| | |
|---|---|
| 18 U.S.C. § 506 | 18 |
| 18 U.S.C. § 710 | 10 |
| 18 U.S.C. § 844 | 18 |
| 18 U.S.C. § 924 | 18 |
| 18 U.S.C. § 1503 | 18 |
| 18 U.S.C. § 3143 | 18 |
| 18 U.S.C. § 3551 | 18 |
| 18 U.S.C. § 3553 | 18 |
| 18 U.S.C. § 3559 | 18 |
| 18 U.S.C. § 3621 | 18 |
| 18 U.S.C. § 3624 | 10, 14, 15, 18 |
| 18 U.S.C. § 4014 | 18 |
| 18 U.S.C. § 4161 | 11 |
| 28 U.S.C. § 994 | 14 |
| 28 U.S.C. § 1361 | 3 |
| 28 U.S.C. § 1651 | 3 |
| 28 U.S.C. § 2241 | 3, 4, 5, 6 |
| 28 U.S.C. § 2255 | 5 |
| 28 C.F.R. 523.20 | 12 |
| U.S.S.G. 5 C1.1 | 14 |


Bureau of Prisons Program Statements

| | |
|---|---|
| 5100.07 | 12 |
| 5880.28 | 12 |

Cases

| | |
|---|---|
| Ashkenazi v. Attorney General | 22 |
| Bailey v. United States | 13 |
| Belom v. National Futures Association | 18 |
| Bifulco v. United States | 16 |
| Byrd v. Moore | 22 |
| Casanova v. Dubois | 7 |
| Crandon v. United States | 19, 20 |
| Davis v. Fechtel | 7 |
| Davis v. Michigan Dept. of Treasury | 13 |
| Ferguson v. Ashcroft | 22 |
| Gonzalez v. United States | 5 |
| Guitard v. United States Secretary of Navy | 8 |
| Hernandez v. Campbell | 5 |
| Howard v. Ashcroft | 22 |
| Iacaboni v. United States | 5, 22, 23, 24 |
| Johnson v. United States | 14 |
| Jones v. United States | 13 |
| Lynce v. Mathis | 17 |
| Mallory v. United States | 22 |
| McDonald v. Federal Bureau of Prisons | 23 |
| Monahan v. Winn | 5, 7, 23, 26 |
| Mujahid v. Daniels | 20 |
| Pearson v. United States | 22 |
| Preiser v. Rodriguez | 17 |
| Raines v. United States Parole Commission | 14 |
| Scheidler v. NOW | 16 |

Stone v. INS                                          15

Sullivan v. Stroop                                   15

Tipton v. Federal Bureau of Prisons                  22

Tyler v. Cain                                        13

United States v. Blake                               14

United States v. Canavan                             23

United States v. Gonzales                            13

United States v. LaBonte                             13

United States v. Morales-Alejo                       14

United States v. Pacheco-Camacho          17, 18, 19

United States v. Serpa                               22

United States v. Tkabladze                           22

United States v. West                            7, 22

United States v. Wiltberger                          13

Von Hoffburg v. Alexander                             8

Weaver v. Graham                                     17

White v. Scibana                          17, 18, 19

Zucker v. Menifee                             7, 8, 26

FACTUAL HISTORY

On September 12, 2002, Petitioner plead guilty to one count of possession of child pornography in the Southern District of New York, with the advice of counsel, Paul E. Davison, Esquire, Federal Public Defender. The acceptance of the plea agreement was based, in pertinent part, on being advised by counsel that he would receive Good Conduct Time (CCC) credit for 15% of his imposed term of imprisonment and serve the final six months of his incarceration in a halfway house. At sentencing on December 12, 2002, Judge McMahon was presented with the recommendations of two evaluating psychologists, numerous letters submitted on the Petitioner's behalf, and documentation of the potentially harmful impact of Petitioner's extended incarceration on both his then-90-year-old mother and his wife. The judge nevertheless denied Petitioner's Motion for a downward departure and sentenced Petitioner to a term of imprisonment of twenty-seven months. Pursuant to the judge's orders, Petitioner surrendered voluntarily to the custody of the Federal Bureau of Prisons (BOP) at the Federal Correctional Institution at Fort Dix, New Jersey on April 2, 2003.

Following Petitioner's incarceration, his mother's condition deteriorated significantly, and on August 15, 2003, he filed a Petition for Commutation of Sentence. To date, that Petition is still pending before the United States Pardon Attorney, while his mother's condition continues to worsen.

On March 31, 2004, Petitioner was transferred to the Federal Medical Center - Devens at Ayer, Massachusetts.

1

On April 15, 2004, a printout of Petitioner's Sentence
Monitoring Computation Data showed his Pre-release Preparation
Date (the date he would be sent to a halfway house) to be December
31, 2004, and his projected Release Date as March 11, 2005, via
GCT release.  Believing these to be incorrect, Petitioner dis-
cussed the matter with his Case Manager but was told that she had
no authority to make the requested changes.  Petitioner then sub-
mitted an Inmate Request to Staff (Form BP-S148.055) to the In-
mate System Manager on March 23, 2004, asking that these dates
be corrected.  On the same date, he also submitted a Form BP-
S148.055 to his Unit Team in which the issues addressed in his
Petition for Commutation of Sentence were raised and updated to
include the continued deterioration of his mother's health and
asking for compassionate release to either a halfway house or
home confinement.

On May 5, 2004, having received no reply from the Inmate
System Manager, Petitioner filed a Form BP-8½ with his Counselor,
requesting Informal Resolution.  Later that day, the Counselor
arranged a meeting with the staff member who was identified as
being responsible for the calculation of both Pre-release Prepa-
ration and Release Dates.  Petitioner was told by that individual
that the formulas used for the calculations were provided by the
BOP under the direction of the Attorney General of the United
States, and that they would not be changed unless instructed to
do so by that office or by an Order of Court.

It is important to note that Petitioner was transferred to
the Federal Medical Center - Devens on March 31, 2004, in order
to participate in a new program that did not exist at the time of
sentencing.  Initial involvement with this program has carried the

2

implied threat that unsatisfactory performance in or compliance with this program could result in denial of his eligibility for CCC placement. Prior to the transfer from Fort Dix to Devens, Petitioner had been told by his Unit Team that he would be transferred to a halfway house on his Pre-release Preparation Date. Any impact of this new program on Petitioner's eligibility for placement in a halfway house that would prevent or delay such a placement must, therefore, be construed as an Ex Post Facto retroactive application of a newly-developed set of criteria, and consequently in direct violation of Petitioner's Due Process rights.[1].

Petitioner, therefore, now files this Petition for Writ of Habeas Corpus under Title 28 U.S.C. § 2241 and/or Writ in the Nature of Mandamus under Title 28 U.S.C. §§ 1361 and 1651.

---

[1].Petitioner is personally aware of at least two fellow inmates at FCI-Fort Dix who, having been convicted of the same offense, were transferred to a CCC prior to their release.

3

QUESTIONS PRESENTED

I.  Is a Petition for Writ of Habaes Corpus under Title 28 U.S.C. § 2241 the appropriate mechanism for the relief sought?
Suggested answer: Yes.


II.  Should Petitioner be excused from having to exhaust all of his administrative remedies before filing this Petition?
Suggested answer: Yes.


III.  Should Respondent be required to correct Petitioner's projected Release Date to include 121.5 days of Good Conduct Time credit instead of 105 days?
Suggested answer: Yes.


IV.  Should Respondent be required to correct Petitioner's Pre-release Preparation Date to provide a full six months at a Community Corrections Center and/or Home Confinement?
Suggested answer: Yes.


V.  Does the Court have the authority to Order the relief sought?
Suggested answer: Yes.

4

ARGUMENTS

I. Is a Petition for Writ of Habeas Corpus under Title 28 U.S.C.
§ 2241 the appropriate mechanism for the relief sought?

Suggested answer: Yes.

In the brief period of time between the BOP's implementation
of the policy under attack and the filing of this Petition, this
Court has already addressed this issue under both § 2255 and
§ 2241.  In Iacaboni v. United States, 251 F.Supp.2d 1015 (D. Mass.
2003)(Ponsor, J.), the Court adjudicated the claim of one of the
three petitioners under § 2255 noting that it could instead invoke
remedial powers under § 2241 if necessary.  Id. at 1017, n.1.  In
Monahan v. Winn, 276 F.Supp.2d 196 (D.Mass.2003)(Gertner, J.), the
Court noted that, "It is well established that challenges to the
'manner, location, or conditions of a sentence's execution' are
proper subjects of a habeas corpus action under § 2241."  Id. at
204, citing Gonzales v. United States, 150 F.Supp.2d 236, 240 (D.
Mass.2001), which, in turn, cited Hernandez v. Campbell, 204 F.3d
861, 864 (9th Cir. 2000).  In Iacaboni, the afore-said petitioner
(Mark Pandolfi) had not yet surrendered to BOP custody, as was the
case with Dennis Monahan, while Frank Iacaboni was already im-
prisoned at a halfway house and was to be transferred to "a distant,
high-security facility."  Id. at 1019.

In the instant case, Petitioner is already serving his sentence
and is currently incarcerated at the Federal Medical Center - Devens,
where Respondent is responsible for the implementation of the flawed
BOP policies which are under attack in this matter.  Therefore, it

5

is appropriate for Petitioner to bring this action under Title
28 U.S.C. § 2241.

II.  Should Petitioner be excused from having to exhaust all of his administrative remedies before filing this Petition?

Suggested answer: Yes.


While the government has, in previous cases regarding the abrupt change in the BOP's halfway house placement policy, urged courts to dismiss petitions such as the instant case for failure to exhaust all administrative remedies, this argument has been consistently rejected.  In Monahan, this Court noted that these cases "do not challenge 'prison conditions' as that is commonly understood under § 1983.  Rather, they challenge the BOP's rule revision that deprives it of legal discretion to designate certain offenders to community confinement facilities when performing its statutory duty to execute criminal sentences [footnote omitted].  ... the statutory PLRA exhaustion requirement does not apply."  Id. at 204, citing Davis v. Fechtel, 150 F.3d 486 (5th Cir.1998) and United States v. West, 2003 WL 1119990.  The Court also noted that exhaustion of administrative remedies may be raised as a waivable affirmative defense, but is not a jurisdictional require- ment.  Monahan, 204 n.8, citing Casanova v. Dubois, 304 F.3d 75, 78 n.3 (1st Cir.2002)(adopting the position of a majority of cir- cuits that the PLRA exhaustion requirement is a non-jurisdictional affirmative defense).

The analysis of this issue is carried even further in Zucker v. Menifee, 03 Civ. 10077 (RJH) (S.D.N.Y.2004).  The Zucker court noted that

Failure to exhaust may be excused when any of the following circumstances apply: "(1) available remedies provide no

7

'genuine opportunity for adequate relief'; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be 'futile'; and (4) in certain instances [when] a plaintiff has raised a 'substantial constitutional question.'" Guitard v. United States Secretary of Navy, 967 F.2d 737, 741 (2d Cir.1991)(citing Von Hoffburg v. Alexander, 615 F.2d 633, 638 (5th Cir.1980), and cases cited therein).

Zucker at 7-8. The court agreed that exhaustion of administrative remedies would, in fact, be futile, since the highest level of administrative appeal that is available to a Federal inmate is to the BOP's General Counsel who is, in turn, subordinate in authority to that of the United States Attorney General. It is, of course, that authority which is the source of the opinion which is being challenged.

In the instant case, Petitioner would also experience the same futility, as the BOP has never rescinded its policy in spite of the fact that courts have unequivocally declared it to be legally invalid. Furthermore, Petitioner has already pursued four levels of administrative remedy (requesting the change of dates from his Unit Team, requesting the change of dates from the Inmate System Manager and filing Form BP-8½ which, in turn, resulted in a conference with the staff who perform the calculations). None of these provided relief. With August 23, 2004, as the arguable date by which Petitioner believes he should be transferred to a halfway house, further delay would likely result in irreparable injury by forestalling adjudication of the merits of this Petition well beyond that date.

8

While the exhaustion issue has not been raised in prior challenges to the BOP's method of calculating GCT credit, the combined effect of both issues on Petitioner's transfer to a halfway house, as raised in the instant case, makes it appropriate for this Court to wave any and all questions of exhaustion of administrative remedies and proceed immediately to the merits of this Petition.

III.   Should Respondent be required to correct Petitioner's projected Release Date to include 121.5 days of Good Conduct Time credit instead of 105 days?

Suggested answer: Yes.


When Congress enacted the current good time statute as part of the Comprehensive Crime Control Act of 1984 (CCCA), they adhered to a long legislative history in the careful choice of language:

> [A] prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term . . . . [C]redit for the last year or portion of a year of the term of imprison- ment shall be prorated and credited within the last six weeks of the sentence.

18 U.S.C. § 3624(b)(1).   The 1902 version [18 U.S.C. § 710 (repealed 1944)] allowed a well-behaved prisoner to serve less time by receiving credit for good time against "the term of his sentence."  When Congress adopted new statutory language in 1948, some courts construed the new language "as requiring good time to be computed on the basis of actual time served rather than on the basis of the term of the sentence as imposed by the court."  H.R. Report 86-935 (Aug. 18, 1959), reprinted in 1959 U.S.C.C.A.N. 2518, 2519.  The precise problem Petitioner is ex-

10

periencing developed first over 40 years ago: "The effect of
this interpretation is to require well-behaved prisoners to serve
longer periods of confinement that they would under the method of
computation which had been used through half a century." Id.  To
solve this problem, Congress, in 1959, deleted the time served to
assure the methodology of crediting against the sentence, not time
served.  Id.

From 1959 to 1984, the good time allowance varied depending
on the length of the sentence imposed.  18 U.S.C. § 4161 (repealed
1984).  The current version specifically employed the phrase "term
of imprisonment," consistent with its extensive use elsewhere.  The
Federal Criminal Code, especially the CCCA, uses "term of imprison-
ment" over one hundred times.  "Term of imprisonment" always means
the sentence imposed by the judge.

In spite of the obvious, unambiguous wording of the law, the
BOP has chosen to deliberately subvert the intent of Congress in
the manner by which this statute is implemented.  Their formula-
tion explicitly rejects crediting good time against the sentence
imposed by substituting the phrase "for each year served" for
"term of imprisonment."  As applied to Petitioner, the implementing
regulation, in pertinent part, reads:

(a) When considering good conduct time for an inmate
serving a sentence for an offense committed on or after
April 26, 1996, the Bureau shall award:

(1) 54 days credit for each year served (prorated when
the time served by the inmate for the sentence during
the year is less than a full year) if the inmate has
earned or is making satisfactory progress toward earning

11

a GED credential or high school diploma . . . .[1].

28 C.F.R. § 523.20(a)(1) (emphasis added).  Program statement 5880.28 adopts the same reasoning.

The BOP explicitly instructs its personnel to ignore the sentence imposed by the trial judge: "It is essential to learn that [good time credit] is not awarded on the basis of the length of the sentence imposed, but rather on the number of days actually served."  P.S. 5880.28 at 48.  The BOP's method -- covering 26 explanatory pages -- is an eight-step process that the BOP itself terms "arithmetically complicated" (Program Statement 5880.28 at 1-44).  The BOP does not claim that its "arithmetically complicated" formula meets the statutory language -- the BOP formula only "best conforms" to the statute.  Program Statement 5880.28 at 1-44-44A.  Ironically, in the policy statement used to project a prisoner's release date (not the actual calculation), the BOP abandons its tortuous calculation for the simple 15% formula Congress intended:

Expected length of incarceration . . . shall reflect the
total number of months remaining from the inmate's
sentence, less 15% (for sentences over 12 months),
and credit for any jail time served.

Program Statement 5100.07 Ch. 6 at 8 (emphasis added).

Punishment for crime is determined solely by the legislative branch of the government.  The Supreme Court has articulated a number of methods for determining the meaning of statutes: the

---

[1].Petitioner holds a high school diploma, a B.A, M.A. and Ph.D. in psychology, and a J.D.

12

rules of statutory construction.  The good time statute must
therefore be interpreted applying the methods required by the
Supreme Court.

The Supreme Court requires that statutory terms be construed
"in their context and with a view to their place in the overall
statutory scheme." Tyler v. Cain, 533 U.S. 656, 662 (2001)
(quoting Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 809
(1989)); see also Jones v. United States, 527 U.S. 373, 388-89
(1999) (statutory language must be read in context); Bailey v.
United States, 516 U.S. 137, 145 (1995) (same); see United
States v. LaBonte, 520 U.S. 751, 757 (1997) ("[W]e assume that
in drafting this legislation, Congress said what it meant.").
"Where there is no ambiguity in the words, there is no room for
construction.  The case must be a strong one indeed, which would
justify a court in departing from the plain meaning of words ...
in search of an intention which the words themselves did not
suggest."  United States v. Gonzales, 520 U.S. 1,8 (1997)
(quoting United States v. Wiltberger, 18 U.S. (5 Wheat.) 76,
95-96 (1820)(Marshall, C.J.)).

"Term of imprisonment" is one of the most often used phrases
in the federal criminal lexicon.  The federal sentencing statutes
consistently use "term of imprisonment" to refer to the judge's
sentence to imprisonment.  Congress used "term of imprisonment"
dozens of times in the Comprehensive Crime Control Act of 1984,
of which the good time statute is a part, and always used it to
mean the judge's sentence, not actual time in custody.  The
statutes authorizing the Sentencing Commission, and the federal

13

sentencing guidelines themselves, refer to "term of imprisonment" as the sentence imposed by the judge. 28 U.S.C. § 994 (referring throughout to the incarceration ordered in a criminal case as involving a "term of imprisonment"); U.S.S.G. § 5C1.1 (Imposition Of A Term Of Imprisonment).

Whether viewed standing alone or in the context of federal sentencing law, "term of imprisonment" is unambiguous.  In every judgment and commitment order entered in federal court, the trial judge sentences the defendant to be "imprisoned for a term of" whatever the guidelines demand in the particular case.  Administrative Office Form 245 (July 1990) (Judgment in a Criminal Case).  In resolving questions regarding the commencement of the term of supervised release,the Supreme Court and others have read "term of imprisonment" in 18 U.S.C. § 3264(a) and (e) as actual incarceration plus good time credits.  See Johnson v. United States, 529 U.S. 53, 58-59 (2000); United States v. Morales-Alejo, 193 F.3d 1102, 1105-6 (9th Cir.1999); United States v. Blake, 88 F.3d 824,825 (9th Cir.1996).  Even under the earlier parole statutes, "term of imprisonment" meant the entire sentence -- time in custody plus time on supervision.  Raines v. U.S. Parole Commission, 829, F.2d 840, 844 (9th Cir.1987) ("Term of imprisonment includes time on parole.").

As Congress well knew, the words "term of imprisonment" have a well-understood, unequivocal meaning.  "Term of imprisonment" is unambiguous in its myriad uses and is not ambiguous in the application of 54 days credit against each year of a multi-year sentence.

The Supreme Court has instructed that identical words -- such

14

as "term" and "term of imprisonment" --appearing in different
parts of the same act have the same meaning.  Sullivan v.
Stroop, 496 U.S. 478, 484 (1990).  Under the rule of intra-
statutory consistency, "term of imprisonment" means the same
thing in the same sentence.

Despite the BOP's agreement that "term of imprisonment" in
the very first phrase of the first sentence of the statute means
the judge's sentence, the agency ascribes a different meaning
thereafter.  Where the exact same words are used later in the
statute, the BOP claims the same words mean "time actually served."

When Congress means time served, Congress says "time served,"
not "term of imprisonment.  In Section 3624(b), the phrase "time
served" is used to specify that the 54 days is credited "beyond
the time served."  Under controlling Supreme Court authority, the
BOP's reading of the statute is simply untenable.  Congress did
not intend that "term of imprisonment" have different meanings
in the same sentence, one of which means the same as "time served,"
especially since the use the phrase "time served" in the same
sentence to convey precisely that concept.

When Congress amends a statute, Congress intends its
amendment to have real and substantial effect.  Stone v. INS,
514 U.S. 386, 397 (1995).  In 1959, Congress consciously amended
the statute to calculate good time against the judge's sentence,
not on time served.  The basic rule of construction, approved
by the Supreme Court, demonstrates that the statute's relevant
use of "term of imprisonment" is not ambiguous.  The present good
time credit statute preserves the distinction drawn by the 1959

15

amendment by preserving the language to credit the good time against the judge's sentence.  To ignore this would be to ignore Supreme Court direction on how to determine the intent of Congress.

If there were any doubt as to legislative intent, it would be easily clarified by the words of Senator Joseph Biden, co-author of the current statute:

> In the Federal courts, if a judge says you are going to go to prison for 10 years, you know you are going to go to prison for at least 85 percent of that time - 8.5 years, which is what the law mandates.  <u>You can get up to 1.5 years in good time credits, but that is all.</u>  And we abolished parole.  <u>So you know you'll be in prison for at least 8.5 years.</u>

141 Cong. Rec. S2348-01 (dail ed. Feb.9, 1995).  However, the BOP rule allows only 47 days credit for each year of the sentence imposed, requireing no less than 87.2% of the sentence to be served, rather than the 85% envisioned by the statute's authors. **No federal prisoner, no matter how virtuous, ever serves less than 87.2% of the sentence imposed.**

Apart from any question of ambiguity, a criminal statute must be strictly construed.  <u>Scheidler v. NOW</u>, 537 U.S. 393, 408 -9 (2003).  As a statute in Title 18 that dictates how much real time a federal prisoner must serve, Section 3624(b) is a criminal statute covered by this rule of construction.  <u>Bifulco v. United States</u>, 447 U.S. 381, 387 (1980) (parole statute is controlled by rules related to narrow construction of criminal statutes).  The Supreme Court has found that good time statutes are penal in

16

several contexts.  See Lynce v. Mathis, 519 U.S. 433 (1997)
(ex post facto); Weaver v. Graham, 450 U.S. 24 (1981) (same);
Preiser v. Rodriguez, 411 U.S. 475 (1973) (habeas corpus).

The BOP's faulty application of the statute was upheld in
United States v. Pacheco-Camacho, 272 F.3d 1266 (9th Cir.2001).
However, that court was dealing with a sentence of a year and a
day and was therefore addressing the issue of ambiguity involved
in prorating the final day of the sentence.  Clearly, the rules of
statutory construction discussed above show that such an analysis
cannot properly be applied to the instant case.

In a recent District Court decision from the Seventh Cir-
cuit, the court found that a prisoner serving a 10-year sentence
raised a substantial issue regarding the BOP misinterpretation of
the good time credit statute and issued an order to show cause.
White v. Scibana, 2003 WL 23171593, at *1-3 (W.D.Wis. Dec. 22,
2003).  First, the court recognized the plain logic of the
prisoner's position that he should be eligible for up to 54 days
for each of the ten years of his term of imprisonment.  Then, the
court made its way through the complex formula described in the
BOP's Sentence Computation Manual, noting that it seems "unduly
complicated":

> Petitioner complains not without good reason that the
> bureau's method of calculating good time is unduly
> complicated.  However, the bureau is not necessarily
> required to employ a simple method so long as the method
> it applies is consistent with the language of § 3624.
> The key clause of § 3624 provides that an inmate re-
> ceives 54 days of credit "at the end of each year of the

17

prisoner's term of imprisonment." This raises the threshold
question whether the bureau is interpreting "term of im-
prisonment" correctly to mean time served rather than the
sentence imposed.

White at *2 (emphasis in original). The court then noted the
Pacheco-Camacho position on ambiguity and rejected it based on
two factors: the need to construe "term of imprisonment" as
meaning the same thing throughout the statute and the consistent
use of "term of imprisonment" as a "synonym for 'sentence'"
throughout Title 18.

> [A] "time served" construction becomes less plausible when
> the statute is read as a whole. The first clause of §
> 3624(b)(1) states that the statute applies to any "prisoner
> who is serving a term of imprisonment of more than 1 year."
> In this context, "term of imprisonment" must refer to the
> sentence imposed. It would be impossible to determine
> whether an inmate qualified for good time credit by looking
> at how much time he would serve after his good time was
> taken into account. Courts presume that Congress intends
> to give the same meaning to the same term used in different
> parts of a statute. Belom v. National Futures Association,
> 284 F.3d 795, 798 (7th Cir.2002). In addition, when Congress
> has used "term of imprisonment" in other statutes, it
> generally does so as a synonym for "sentence. See, e.g.,
> 18 U.S.C. § 506(b)(3); 18 U.S.C. § 844(h); 18 U.S.C. 924
> (c)(1)(D)(ii); 18 U.S.C. 1503(a); 18 U.S.C. § 3143(b)(1);
> 18 U.S.C. § 3551(b)(3); 18 U.S.C. § 3553(c); 18 U.S.C. §
> 3559; 18 U.S.C. 3621(a); 18 U.S.C. § 4014.

18

White at *3 (emphasis in original).  Finding that the BOP had no discretion to construe an unambiguous statute, the court directed the BOP to show cause why the writ should not issue on Mr. White"s claim that the BOP "is calculating his good time credits in violation of 18 U.S.C. § 3624(b)(1)." Id.  The opinion in White, filed on April 23, 2004, held that "[t]he [BOP] must calculate an inmate's good conduct credit on the basis of his sentence rather than on the time he has served," and ordered that the prisoner be deemed eligible for 54 days for every year of his prison term.  White v. Scibana, 03-C-581 (E. D.Wis. Apr. 23, 2004).

The Pacheco-Camacho court's resolution of their perceived issue of ambiguity is also in violation of the Supreme Court emphasis on the rule of lenity as presented in Crandon v. United States, 494 U.S. 152 (1990) (expressly rejecting deference to an executive agency in the construction of a criminal statute).  In a concurring opinion, Justice Scalia, joined by Justices O'Connor and Kennedy, addressed the weight to be accorded the executive branch's interpretation of the penal statute.  The concurring justices drew a clear line between the executive branch and the judicial branch in interpreting criminal statutes.  "The Justice Department, of course, has a very specific responsibility to determine for itself what this statue means, in order to decide when to prosecute; but we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." Id. at 177 (emphasis added).  The concurrence concluded that the executive's construction of a

19

penal statute "is not even deserving of persuasive effect" because it "would turn the normal construction of criminal statutes upside down, replacing the doctrine of lenity with the doctrine of severity." Id. at 178.

Application of the rule of lenity has deep roots in morality beyond the rule of law and rules of construction. Human freedom is at issue. The rule of lenity grew out of the most ancient sources of American constitutional law. As Chief Justice John Marshall recognized, "The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself." United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95 (1820). The English common law took lenity in the construction of criminal statutes as a given. 1 William Blackstone, Commentaries 92 ("A man cannot suffer more punishment than the law assigns, but he may suffer less.").

Finally, it is important to note the impact of the BOP's arbitrary and capricious misinterpretation of the good time statute on both incarcerated offenders and society at large.  In his opening brief in Mujahid v. Daniels, 03-36038 (9th Circuit), Chief Deputy Federal Public Defender, Stephen R. Sady, cites some alarming statistics:

> The BOP formula multiplies the misery for every year
> of the prisoner's sentence.  There are currently approx-
> imately 154,805 federal prisoners serving guideline sen-
> tences greater than one year and less than life.  The mean
> sentence imposed is about 9.5 years.  At seven days per
> year, the time involved is over 28,000 years (154,805 x

20

7 x 9.5 ÷ 365 = 28,204).  At $22,265.00 per year for
non-capital incarceration expenditures, the meager seven
days on each year of a prisoner's sentence could amount
to over $628 million in taxpayer money that Congress did
not intend or authorize to expend on incarceration for
current prisoners, and over $66 million more for each new
year.  The human costs of this over-incarceration defy
quantification.

Id. at 37-38.  Supreme Court Justice Kennedy stated the concern
very plainly in his address to the American Bar Association last
year: "And in my view our resources are being misspent, our
punishments are too severe and our sentences are too long."
Justice Anthony M. Kennedy, Speech at the American Bar Association
Annual Meeting (Aug. 9, 2003), available at http://www/supremecourtus.
gov/publicinfo/speeches/sp_08-09-03.html.

The instant case offers this Court the opportunity to use
its authority as a check on an executive branch that is distorting
Congress's good time credit statute to over-punish, over-incar-
cerate, and over-tax the people.

IV.  Should Respondent be required to correct Petitioner's Pre-release Preparation Date to provide a full six months at a Community Corrections Center and/or Home Confinement?

Suggested answer: Yes.


Respondent's calculation of Petitioner's Pre-release Preparation Date (the date at which he is to be transferred to a halfway house) is based on the BOP change in policy that was promulgated in December, 2002.  Prior to December 13, 2002, placement in a Community Corrections Center (CCC) for the final six months of an offender's sentence was routine.  The policy change inquestion has been extensively litigated with consistent results:

    Numerous courts across the country have found the new BOP policy to be legally invalid on a variety of grounds. See, e.g., Iacaboni v. United States, 251 F.Supp.2d 1015 (D. Mass.2003)(Ponsor, J.); Pearson v. United States, 265 F.Supp. 2d 973 (E.D.Wis.2003); Tipton v. Federal Bureau of Prisons, 262 F.Supp.2d 633 (D.Md.2003); Byrd v. Moore, 252 F.Supp.2d 293 (W.D.N.C.2003); United States v. Serpa, 251 F.Supp.2d 988 (D.Mass.2003)(Young, C.J.); Ferguson v. Ashcroft, 248 F.Supp 2d 547 (M.D.La.2003); Howard v. Ashcroft, 248 F.Supp.2d 518 (M.D.La.2003); Ashkenazi v. Attorney General, 246 F.Supp.2d 1 (D.D.C.2003); United States v. Tkabladze, Nos. CV 03-01152, CR 02-0434(A) (C.D.Cal. May 16,2003)(slip op.); Mallory v. United States, 2003 WL 1563764 (D.Mass. Mar. 25,2003)(Wood-lock, J.); United States v. West, 2003 WL 1119990 (E.D.Mich.

Mich.2003); <u>McDonald v. Federal Bureau of Prisons</u>, No. 03-
CV-235 (N.D.Ga. Feb. 14,2003); <u>United States v. Canavan</u>,
2003 WL 245226 (D.Minn. Jan. 22,2003).

<u>Monahan</u> at 199.   Four judges in this district have already made it
clear that the BOP may not legally enforce this new policy (Gertner,
J.; Ponsor, J.; Woodlock, J. and Young, C.J.), and yet Respondent
continues to ignore even the specific holding against him, personally,
in <u>Monahan</u>:

> First, "the well-established practice of the BOP"
> of placing certain offenders in community confinement to
> serve some or all of their terms of imprisonment "was not
> and is not, even remotely 'unlawful.'"   <u>Iacaboni</u>, 251 F.Supp.2d
> at 1017-1018.   Second, "the BOP's manner of adopting this
> fundamental change, even assuming it had substantive merit,
> was improper" under the Administrative Procedure Act.   <u>Id.</u>
> at 1018.   Third, the retroactive application of this policy
> violates the Constitution.   <u>See id.</u>  Offender classification
> and assignment decisions made pursuant to this policy are
> therefore invalid, and the BOP retains the discretion to
> employ community confinement as it always did prior to
> December of 2002.

<u>Monahan</u> at 199-200.   Petitioner's scheduled Pre-release Prepara-
tion date of December 31, 2004, is based on 10% of his expected
length of incarceration which, in turn, is predicated on a Release
Date of March 11, 2005.   The latter is determined by the BOP's
method of calculating GCT credit which has been attacked <u>supra</u>.

In the instant case, all three prongs of Judge Ponsor's

23

condemnation of the BOP policy apply. As cited above, the courts
have unequivocally held that the reinterpretation of 18 U.S.C.
§ 3621(b) in the December 13, 2002, eight-page memorandum written
by a "Principal Deputy Assistant Attorney General" in the Department
of Justive -- the document which created this upheaval -- is
"simply false," it "flies in the face of the controlling statute,"
and is "invalid." Iacaboni at 1018. Nothing has occurred since
then to make the policy any more legal than it was. Therefore,
Petitioner is being deprived of approximately three and a half
months of CCC confinement by an invalid policy.

Similarly, the violation of the Administrative Procedure
Act remains, causing the new approach to be "without effect." Id.
at 1018.

Finally, it is significant to note that Petitioner entered
his guilty plea on September 12, 2002, and was sentenced on
December 12, 2002. Both dates are clearly before the issuance of
the DAG memorandum and the ensuing BOP policy change. Therefore,
even if the abrupt renunciation of a long-standing policy could
even remotely be construed as valid, retroactive application to
Petitioner is a clear violation of his constitutionally guaranteed
Ex Post Facto and Due Process rights. Petitioner's plea, which
could have been withdrawn at any time prior to sentencing, was
based, in pertinent part, on the understanding that, pursuant to
BOP policy, he would serve the final six months of his sentence
in a halfway house. To deprive him of the full amount of that
time is clearly illegal, invalid and unconscionable.

The issue of unlawful retroactivity of this particular BOP
policy must also extend to any and all policy or program changes
which were instituted by the BOP after December 12, 2002. It

would be an affront to the Court and an injustice to Petitioner
if, after Respondent were to be Ordered by the Court to correct
Petitioner's Pre-release Preparation Date, he were then to attempt
to invoke a newly-implemented program to remove or reduce
Petitioner's eligibility for CCC placement.  Only a _change_ in
the Petitioner, himself, can legitimately result in a change in
his eligibility.  The implied threat of a denial of CCC eligi-
bility is clearly a violation of Petitioner's Ex Post Facto and
Due Process Rights.

25

V.  Does the Court have the authority to Order the relief sought?

Suggested answer: Yes.

In spite of the fact that Respondent has already been told by this Court that the policy under which he is limiting Petitioner's CCC placement is legally invalid (Monahan at 222), he continues to adhere to it.  In Monahan, the Court further held that, "Improperly subjecting offenders to prison rather than community confinement inflicts irreparable harm on them, their families, and their communities," (Id. at 222) and ordered Respondent accordingly.

In Zucker, the court invoked "its power under 28 U.S.C. § 1651, the All Writs Act, to issue a writ in the nature of mandamus compelling Warden Menifee to act promptly and in good faith to reconsider petitioner for CCC placement consistent with the BOP policy in place prior to December 2002." Zucker at 22, footnote omitted.

Similar orders have been issued in the cases cited above, as the various courts have forced the BOP to implement their holdings. Clearly, this Court has already demonstrated its authority to Order such relief as is necessary to protect and insure Petitioner's rights, including retaining jurisdiction over this matter for the duration of Petitioner's term of imprisonment.

26

RELIEF SOUGHT

Petitioner respectfully prays the Court to Order Respondent to comply with statutory and case law as determined by this and other courts regarding the calculation of both Petitioner's Pre-release Preparation Date and Release Date; specifically:

1.  Order Respondent to credit Petitioner with 121.5 days of Good Conduct Time.

2. Order Respondent to transfer Petitioner to a Community Corrections Center within close proximity to his home and/or to Home Confinement no later than six months prior to his Release Date.

3.  Order Respondent to perform the above in good faith adherence to Policies and Programs which  were in effect at the time of Petitioner's sentencing.

Petitioner further prays the Court to retain jurisdiction of this matter so as to prevent Respondent from attempting to subvert the Court's instructions; specifically:

4.  Enjoin Respondent from attempting to circumvent the timely release of Petitioner.

5.  Order any subsequent attempt by Respondent to alter or modify

27

the Petitioner's Pre-release Preparation Date, date of actual
transfer to a halfway house (and/or Home Confinement), and/or
Release Date to be subject to review and approval by the Court.

CONCLUSION

At the present time, the Federal prison system holds between 150,000 and 200,000 inmates. All of them are incarcerated because, in some fashion or another, they acted in violation of the law of the land as defined by the statutes and the courts. It is unconscionable that those in whose custody these offenders are placed should, themselves, conduct their business in contemptuous defiance of those same statutes and courts. It would appear that the ancient Roman satirist, Juvenal, phrased it best: Sed quis custodiet ipsos custodes? (But who is to guard the guards themselves?) Decimus Junius Juvenalis, Satires, VI, 1. 347.

Petitioner respectfully looks to this Court for the answer.

Respectfully submitted,

David Sloane
Petitioner, pro se

I, David Sloane, Petitioner, pro se, certify that the foregoing is true and correct to the best of my knowledge or information and belief and that any false statements made therein are made subject to the penalties of applicable laws relating to unsworn falsifications to authorities.

Executed on ___May 12___, 2004.

David Sloane
Petitioner, pro se