# EXHIBIT 5

**NOT FOR PUBLICATION**



UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GERALD DE GEROLAMO,              :
                                  :   Civil Action No. 03-139 (FLW)
          Petitioner,            :
                                  :
     v.                          :   OPINION
                                  :
K.M. WHITE, WARDEN,              :
                                  :
          Respondent.            :

**APPEARANCES:**

   Gerald DeGerolamo, Petitioner pro se
   F.C.I. Fairton
   #80457-054
   P.O. Box 420
   Fairton, NJ 08320

   Louis J. Bizzarri, Assistant United States Attorney
   Camden Federal Building
   401 Market Street
   P.O. Box 1427
   Camden, NJ 08101
      Attorney for Respondent

**WOLFSON**, District Judge

   Petitioner Gerald DeGerolamo ("DeGerolamo"), a prisoner currently confined at the Federal Correctional Institution at Fairton, New Jersey, has submitted a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2241.[1] The sole respondent is Warden K.M. White.

For the reasons stated herein, the Petition must be denied.

## I. BACKGROUND

Petitioner DeGerolamo is currently serving an aggregate 160-month (13 years, 4 months) sentence imposed by the United States District Court for the Southern District of New York in three separate convictions on April 9, 1991, and June 23, 1994.[2] (Petition ¶ 4.1; Answer at 2, 4-5.) The Bureau of Prisons ("BOP") has calculated Petitioner's sentence, according to 18 U.S.C. § 3624(b)(1) and BOP Program Statement 5880.28, to reflect a potential maximum award of 603 days of good time credit,[3] and

---

[1] Section 2241 provides in relevant part:
(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
(c) The writ of habeas corpus shall not extend to a prisoner unless-- ... (3) He is in custody in violation of the Constitution or laws or treaties of the United States ... .

[2] Petitioner was on escape status from March 7, 1992 through April 3, 1993. (Answer at 4.)

[3] Petitioner has been awarded 54 days of good time credit for each full year served on his sentence, beginning January 28, 1991, (the date Petitioner was taken into custody in presentence status), with the exception of the year ended February 24, 1994, (during which he was on escape status), for which year he was awarded 27 days credit, a total of 567 days. It is projected that if no good time credit is disallowed or forfeited between February 24, 2003, and the end of his sentence, Petitioner will be awarded an additional 36 days of good time credit. (Answer at 6-9.)

has projected a release date of October 31, 2003, if all such good time credits are awarded. (Pet. ¶ 4.5; Answer at 3.)

Petitioner contends that the BOP's interpretation of § 3624(b)(1) is contrary to the unambiguous intent of Congress and is depriving him of good time credits that should be awarded under the statute. (Pet. ¶¶ 5.1 - 5.5.) Petitioner contends that the BOP erroneously calculates the good time credits based upon time served, rather than upon the sentence as imposed. (Pet. ¶ 4.4.) He contends that he is entitled to earn a maximum of 718 days good time credit (54 days per year times 13 and 1/3 years),[4] based upon the sentence imposed. He asks this Court to order the Bureau of Prisons to recalculate his good time credits according to what he asserts is the correct interpretation of the statute.

## II. ANALYSIS

As of the time of Petitioner's imprisonment, 18 U.S.C. § 3624(b) provided:

> A prisoner who is serving a term of imprisonment of more than one year, other than a term of imprisonment for the duration of his life, shall receive credit toward the service of his sentence, beyond the time served, of fifty-four days at the end of each year of his term of imprisonment, beginning at the end of the first year of the term, unless the Bureau of Prisons determines that, during that year, he has not satisfactorily complied with such institutional disciplinary regulations as have been approved by the

---

[4] Fifty-four days/year times 13 years 4 months actually yields 720 days.

3

> Attorney General and issued to the prisoner. If the Bureau determines that, during that year, the prisoner has not satisfactorily complied with such institutional regulations, he shall receive no such credit toward service of his sentence or shall receive such lesser credit as the Bureau determines to be appropriate. The Bureau's determination shall be made within fifteen days after the end of each year of the sentence. Such credit toward service of sentence vests at the time that it is received. Credit that has vested may not later be withdrawn, and credit that has not been earned may not later be granted. Credit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence.

18 U.S.C. § 3624(b).[5]

The Bureau of Prisons has codified its interpretation of § 3624(b) at 28 C.F.R. § 523.20.

> Pursuant to 18 U.S.C. 3624(b), as in effect for offenses committed on or after November 1, 1987 but before April 26, 1996, an inmate earns 54 days credit toward service of sentence (good conduct time credit) for each year served. This amount is prorated when the time served by the inmate for the sentence during the year is less than a full year. The amount to be awarded is also subject to disciplinary allowance ....
> ...

This interpretation is implemented through BOP Program Statement ("P.S.") 5880.28. (Answer, Decl. of Joyce Horikawa, Ex. E.) The Bureau of Prisons has determined that "54 days of GCT [("good conduct time")] may be earned for each full year served on a

---

[5] Section 3624(b) has since been amended to provide that credits awarded after the date of enactment (April 26, 1996) of the Prison Litigation Reform Act (Title VII of Pub. L. 104-134) shall vest on the date the prisoner is released from custody," 18 U.S.C. § 3624(b)(2), and that "Credit that has not been earned may not later be granted," 18 U.S.C. § 3624(b)(1).

4

sentence in excess of one year," P.S. 5880.28(g), and has derived a formula to calculate the amount of GCT that may be earned for any fractional year served on a sentence in excess of one year.

> For release purposes, subsection 3624(b) is the most important provision in the computation process since the proper application of that subsection determines the actual statutory date of release for the prisoner. The release date is determined, of course, by subtracting the total amount of GCT awarded during the term of the sentence from the full time date of the sentence. The <u>total</u> amount of GCT awarded during the term of a sentence is found by adding the amount of GCT awarded at the end of each year to the amount of GCT awarded for the last portion of a year.
>
> As noted in (1) above, 54 days of GCT may be awarded for each full year served on a sentence in excess of one year. Since 54 days of GCT per year cannot be divided evenly into one year, or 12 months, or 52 weeks, or 365 days, determining the amount of GCT that may be awarded for the last portion of a year on the sentence becomes arithmetically complicated. The BOP has developed a formula (hereinafter called the "GCT formula") that best conforms to the statute when calculating the maximum number of days that may be awarded for the time served during the last portion of a year on the sentence.
>
> The GCT formula is based on dividing 54 days (the maximum number of days that can be awarded for one year in service of a sentence) into one day which results in the portion of one day of GCT that may be awarded for one day served on a sentence. 365 days divided into 54 days equals <u>.148</u>. Since .148 is less than one full day, no GCT can be awarded for one day served on the sentence. Two days of service on a sentence equals .296 (2 x .148) or zero days GCT; ... seven days equals 1.036 (7 x .148) or <u>1</u> day GCT. The fraction is always dropped.
>
> ...
>
> It is essential to learn that GCT <u>is not</u> awarded on the basis of the length of the sentence imposed, but rather on the number of days actually served. In other

words, when the GCT awarded plus the number of days actually served equals the days remaining on the sentence, then the prisoner shall be released on the date arrived at in the computation process. (days remaining on sentence - (GCT + days served) = release date). ...

P.S. 5880.28(g), <u>Sentence Computation Manual CCCA</u>, at 1-40 through 1-45 (Answer, Decl. of Joyce Horikawa, Ex. E.).

A. <u>Exhaustion of Administrative Remedies</u>

Respondent asks this Court to dismiss the Petition because Petitioner has failed to exhaust his administrative remedies.[6] (Answer at 10-12.) Petitioner does not deny his failure to exhaust administrative remedies, but contends that such exhaustion is not a jurisdictional bar and would be futile, in that he challenges the validity of the Bureau of Prisons' interpretation of § 3624. (Traverse.)

---

[6] The BOP Administrative Remedy Program is a three-tier process that is available to inmates confined in institutions operated by the BOP for "review of an issue which relates to any aspect of their confinement." 28 C.F.R. § 542.10. An inmate must initially attempt to informally resolve the issue with institutional staff. 28 C.F.R. § 542.13(a). If informal resolution fails or is waived, an inmate may submit a BP-9 Request to "the institution staff member designated to receive such Requests (ordinarily a correctional counsel)" within 20 days of the date on which the basis for the Request occurred, or within any extension permitted. 28 C.F.R. § 542.14. An inmate who is dissatisfied with the Warden's response to his BP-9 Request may submit a BP-10 Appeal to the Regional Director of the BOP within 20 days of the date the Warden signed the response. 28 C.F.R. § 542.15(a). The inmate may appeal to the BOP's General Counsel on a BP-11 form within 30 days of the day the Regional Director signed the response. <u>Id.</u> Appeal to the General Counsel is the final administrative appeal. <u>Id.</u>

Although 28 U.S.C. § 2241 contains no statutory exhaustion requirement, a federal prisoner ordinarily may not bring a petition for writ of habeas corpus under 28 U.S.C. § 2241, challenging the execution of his sentence, until he has exhausted all available administrative remedies. See, e.g., Callwood v. Enos, 230 F.3d 627, 634 (3d Cir. 2000); Arias v. United States Parole Comm'n, 648 F.2d 196, 199 (3d Cir. 1981); Soyka v. Alldredge, 481 F.2d 303, 306 (3d Cir. 1973). The exhaustion doctrine promotes a number of goals:

> (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy.

Goldberg v. Beeler, 82 F.Supp.2d 302, 309 (D.N.J. 1999), aff'd, 248 F.3d 1130 (3d Cir. 2000). See also Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761 (3d Cir. 1996). Nevertheless, exhaustion of administrative remedies is not required where exhaustion would not promote these goals. See, e.g., Gambino v. Morris, 134 F.3d 156, 171 (3d Cir. 1998) (exhaustion not required where petitioner demonstrates futility); Lyons v. U.S. Marshals, 840 F.2d 202, 205 (3d Cir. 1988) (exhaustion may be excused where it "would be futile, if the actions of the agency clearly and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable harm"); Carling v. Peters, 2000 WL 1022959,

*2 (E.D. Pa. 2000) (exhaustion not required where delay would subject petitioner to "irreparable injury").

Here, there is no need to develop a factual record, nor does this matter require application of the agency's particular expertise. Petitioner does not challenge the application of the agency's regulations to him, but challenges whether the regulation and Program Statement accurately implement the statute pursuant to which they were promulgated. This is a question within the expertise of courts. See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). Accordingly, the purposes of the exhaustion requirement would not be served by requiring the Petitioner to exhaust his administrative remedies, and this Court will proceed to determine Petitioner's claim on the merits.

B.   The Good Conduct Time Credits

Respondent contends that § 3624 is unambiguous, and the Bureau of Prisons has correctly interpreted the statute and, to the extent the statute can be construed as silent or ambiguous as to the basis for GCT, the Bureau of Prisons' interpretation is reasonable and entitled to deference under the rule of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.

8

837, 842-43 (1984). (Answer at 18-24.) This Court agrees with Respondent.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).

Two Circuit Courts of Appeals have addressed the statutory-construction issue presented here by Petitioner. In Williams v. LaManna, 20 Fed.Appx. 360, 361, 2001 WL 1136069 (6th Cir. Sept. 19, 2001) (unpubl.), the Court of Appeals for the Sixth Circuit held that "[t]he statute clearly states that good conduct time is awarded on time served by the inmate, not on the time that might potentially be served by the inmate."

The Court of Appeals for the Ninth Circuit did not find the language so clear. "In this case, the words of the statute do not provide clear guidance as to what the phrase 'term of imprisonment' means." Pacheco-Camacho v. Hood, 272 F.3d 1266, 1268 (9th Cir. 2001) (involving a claim by a prisoner sentenced to a term of imprisonment of one year and one day), cert. denied,

9

535 U.S. 1105 (2002). The Court further held that the legislative history did nothing to remove that ambiguity. Id. at 1269. Proceeding to the second step of the Chevron analysis, the Court found that the language granting the BOP authority to award or withhold good time credits and providing for proration of the credit for the last year or portion of a year implicitly charged the Bureau of Prisons with implementation of the proration scheme. Id. at 1270. The Court held that the agency's interpretation of the statute and proration formula were reasonable, and entitled to deference, in that they prevent prisoners from receiving a windfall, in the form of full credit for time they do not serve, and they enable prisoners to estimate with certainty the time of their release. Id. at 1268-71.

Finally, the court rejected the prisoner's suggestion that his interpretation of the statute should be preferred because of the rule of lenity, which "ensures that the penal laws will be sufficiently clear, so that individuals do not accidentally run afoul of them and courts do not impose prohibitions greater than the legislature intended." Id. at 1271 (citing United States v. Bass, 404 U.S. 336, 347-48 (1971)). The court noted that the rule of lenity does not prevent an agency from resolving statutory ambiguity through regulation, id. (citing Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 705 n.18 (1995)), and held that the BOP's regulation "gives

the public sufficient warning to ensure that nobody mistakes the ambit of the law or its penalties," id. at 1272.

This Court is of the opinion that the language of the statute is not ambiguous and that the BOP regulation and Program Statement correctly interpret and implement the statute. The statute specifically contemplates the award of GCT credit incrementally, in the amount of a maximum of 54 days at the end of each year of the term, and in an amount proportionately less than 54 days for any fractional portion of a year left at the end of the term, taking into account the reductions that have been made incrementally at annual intervals. This is the scheme employed by the Bureau of Prisons and applied here to Petitioner. To the extent the language of the statute could be deemed ambiguous, this Court adopts the reasoning of the Court of Appeals for the Ninth Circuit in Pacheco-Camacho.

### III. CONCLUSION

For the reasons set forth above, the Petition must be denied. An appropriate order follows.

*Freda L. Wolfson*
United States District Judge

Dated: May 20, 2003

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

GERALD DE GEROLAMO, :
                                                                Civil Action No. 03-139 (FLW)
      Petitioner, :

      v. : **ORDER**

K.M. WHITE, WARDEN, :

      Respondent. :

    For the reasons set forth in the Opinion filed herewith,

IT IS on this _20th_ day of _May_, 2003;

    ORDERED that the Petition is DENIED.

FILED

MAY 20 2003

AT 8:30
_____
WILLIAM T. WALSH

_____
Freda L. Wolfson
United States District Judge

ENTERED
ON
THE DOCKET

MAY 20 2003

WILLIAM T. WALSH, CLERK
By_____ (Deputy Clerk)

# EXHIBIT 6



U.S. Department of Justice
Federal Bureau of Prisons

# Change Notice

**DIRECTIVE AFFECTED:** 7310.04
**CHANGE NOTICE NUMBER:** 7310.04
**DATE:** 12/16/98

1. **PURPOSE AND SCOPE**. To reissue the Program Statement on **Community Corrections Center (CCC) Utilization and Transfer Procedures**.

2. **SUMMARY OF CHANGES**. This reissuance incorporates text consistent with the recently issued Program Statement on Categorization of Offenses. In addition, text and procedural improvements recommended by field and Regional Office staff have also been incorporated. These changes are summarized below:

- Incorporates recommendations made by the Mothers and Infants Together (MINT) workgroup;
- Allows inmates who are otherwise eligible for camp placement to be transferred to a camp prior to transfer to a CCC; and,
- Eliminates the possibility of "stacking" time in a halfway house by combining Bureau referral placement with public law or supervised release placement.

3. **ACTION**. File this Change Notice in front of the Program Statement on **Community Corrections Center (CCC) Utilization and Transfer Procedure**.

/s/
Kathleen Hawk Sawyer
Director



U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

OPI: CPD
NUMBER: 7310.04
DATE: 12/16/98
SUBJECT: Community Corrections Center (CCC) Utilization and Transfer Procedure

1. __PURPOSE AND SCOPE__.  To provide guidelines to staff regarding the effective use of Community Corrections Centers (CCCs).  This Program Statement defines placement criteria for offenders, requires that staff members start the placement process in a timely manner, and defines the circumstances when inmates may refuse Community Corrections (CC) programs.  It also establishes an operational philosophy for CCC referrals that, whenever possible, eligible inmates are to be released to the community through a CCC unless there is some impediment as outlined herein.

CCCs provide an excellent transitional environment for inmates nearing the end of their sentences.  The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills.

One reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community.  Participating in community-based transitional services may reduce the likelihood of an inmate with limited resources from recidivating, whereas an inmate who is released directly from the institution to the community may return to a criminal lifestyle.  While clearly dangerous inmates should be separated from the community until completing their sentences, other eligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society.

Finally, the scope of this Program Statement has been extended to include CCC consideration/placement of District of Columbia Department of Corrections inmates.

```
                                                         PS 7310.04
                                                         12/16/98
                                                         Page 2
```

2.  <u>PROGRAM OBJECTIVES</u>.  The expected results of this program are:

   a.  All eligible inmates will have opportunities to participate in CCC programs to assist with their reintegration into the community, in accordance with their release needs.

   b.  All inmates will have opportunities to communicate directly with staff who make significant CCC referral recommendations.

   c.  Referral packets for CCC placement will be timely and complete.

   d.  Before any inmate is transferred to a CCC, the CCC staff will have the required notice and other documentation.

   e.  The public will be protected from undue risk.

3.  <u>DIRECTIVES AFFECTED</u>

   a.  <u>Directive Rescinded</u>

       PS 7310.03    Community Corrections Center (CCC) Utilization and Transfer Procedures (3/25/96)

   b.  <u>Directives Referenced</u>

       PS 1434.06    Jurisdiction on Escape Related Issues - Memorandum of Understanding USMS/FBI/BOP (7/25/94)
       PS 1490.04    Victim and Witness Notification (2/3/98)
       PS 5100.06    Security Designation and Custody Classification Manual (6/7/96)
       PS 5110.12    Notifications of Release to State and Local Law Enforcement Officials (1/21/98)
       PS 5180.04    Central Inmate Monitoring System (8/16/96)
       PS 5250.01    Public Works and Community Service Projects (1/19/93)
       PS 5264.06    Telephone Regulations for Inmates (12/22/95)
       PS 5280.08    Furloughs (2/4/98)
       PS 5322.10    Classification and Program Review of Inmates (9/4/96)
       PS 5325.05    Release Preparation Program, Institution (7/18/96)
       PS 5330.10    Drug Abuse Programs Manual, Inmate (5/25/95)
       PS 5380.05    Financial Responsibility Program, Inmate (12/22/95)

```
PS 5550.05    Escape from Extended Limits of Confinement
              (3/27/96)
PS 5553.05    Escapes/Deaths Notification (9/17/97)
PS 5800.07    Inmate Systems Management Manual (12/24/91)
PS 5800.11    Central File, Privacy Folder, and Parole Mini
              File (9/7/97)
PS 5873.05    Release Gratuities, Transportation, and
              Clothing (9/4/96)
PS 5882.03    Fines and Costs (2/4/98)
PS 6000.05    Health Services Manual (9/15/96)
PS 6070.05    Birth Control, Pregnancy, Child Placement,
              and Abortion (8/9/96)
PS 7300.09    Community Corrections Manual (1/12/98)
PS 7320.01    Home Confinement (9/6/95)
PS 7331.03    Pretrial Inmates (11/22/94)
PS 7430.01    Community Transitional Drug Treatment
              Services, Inmate (1/20/95)

18 U.S.C. § 3621(b)
18 U.S.C. § 3624(c)
```

4. **STANDARDS REFERENCED**

   a. American Correctional Association 3rd Edition Standards for Adult Correctional Institutions: 3-4265, 3-4343, 3-4343-1, 3-4387, 3-4388, 3-4388-2, 3-4389, 3-4391, 3-4393, 3-4393-1

   b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-3E-04, 3-ALDF-4E-19, 3-ALDF-4E-19-1, 3-ALDF-4F-04, 3-ALDF-4F-05, 3-ALDF-4F-07, 3-ALDF-4G-01, 3-ALDF-4G-06, 3-ALDF-4G-07

   c. American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies: 2-CO-4G-01, 2-CO-4G-02

   d. American Correctional Association Standards for Adult Correctional Boot Camp Programs: 1-ABC-3D-04, 1-ABC-4E-20, 1-ABC-4F-08, 1-ABC-4F-10, 1-ABC-4G-01, 1-ABC-4G-02, 1-ABC-4G-03, 1-ABC-4G-06

5. **STATUTORY AUTHORITY**.  18 U.S.C. § 3624(c), provides:

   "The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last ten per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust

to and prepare for the prisoner's reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation Office shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody."

18 U.S.C. § 3621(b) provides:

"The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility . . . the Bureau determines to be appropriate and suitable." A CCC meets the definition of a "penal or correctional facility."

Therefore, the Bureau is not restricted by § 3624(c) in designating a CCC for an inmate and may place an inmate in a CCC for more than the "last ten per centum of the term," or more than six months, if appropriate.

Section 3624(c), however, does restrict the Bureau in placing inmates on home confinement to the last six months or 10% of the sentence, whichever is less.

6. **PRETRIAL/HOLDOVER AND/OR DETAINEE INMATES**. This Program Statement does not apply to pretrial, holdover, or detainee inmates.

7. **COMMUNITY-BASED PROGRAMS**

   a. **Community Corrections Centers (CCC)**. CCCs, commonly referred to as "halfway houses," provide suitable residence, structured programs, job placement, and counseling, while the inmates' activities are closely monitored. All CCCs offer drug testing and counseling for alcohol and drug-related problems. During their stay, inmates are required to pay a subsistence charge to help defray the cost of their confinement; this charge is 25% of their gross income, not to exceed the average daily cost of their CCC placements. Failure to make subsistence payments may result in disciplinary action.

   These contract facilities, located throughout the United States, provide two program components: the Community Corrections Component and the Prerelease Component:

   (1) The **Community Corrections Component** is designed as the most restrictive option. Except for employment and other structured program activities, an inmate in this component is

```
                                                    PS 7310.04
                                                    12/16/98
                                                    Page 5
```

restricted to the CCC. An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

This orientation period normally lasts for two weeks or until the inmate has demonstrated to CCC staff the responsibility necessary to function in the community. Based on their professional judgment, CCC staff shall determine when an inmate is prepared to advance to the Prerelease Component.

   (2)  The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community. These inmates have more access to the community and family members through weekend and evening passes.

  b.  Community Corrections Programs. In addition to a CCC's traditional services, the Bureau also has the following community-based programs. Referral procedures may be described in independent Bureau directives issuances. The Community Corrections Manager (CCM) reviews the inmate's characteristics and the recommendations noted in the referral package to determine if one of the following programs (if available) may be more appropriate than traditional CCC placement.

   (1)  Comprehensive Sanctions Center (CSC). The CSC concept, initiated by the Bureau, with the extensive cooperation and teamwork of U.S. Probation and CCC contractors, was developed to provide courts with a wider range of sentencing options and to facilitate the development and implementation of community program plans tailored to the individual needs of prerelease inmates.

   The CSC is designed to meet the needs of higher risk prerelease inmates and consists of six different levels of supervision, ranging from 24-hour confinement to Home Confinement.

   It also may have an intensive treatment component consisting of substance abuse education and treatment, life skills training, mental health counseling, education, employment assistance, and mentoring. The inmate's progress is systematically reviewed by a Program Review Team (PRT), consisting of representatives from the Bureau, U.S. Probation, and the CCC.

   (2)  Mothers and Infants Together (MINT). MINT is an alternative residential program that promotes bonding and parenting skills for low risk female inmates who are pregnant. The inmate is placed in the program two months prior to delivery and remains there for three months after delivery.