10. The Program Statement on Fines and Costs describes institution responsibilities for CCC transfers for inmates who have fines. If the inmate has a committed fine, include this information in item 11.

11. It is extremely important to include any information that might have a bearing on the facility's decision to accept the inmate for placement. Information on outstanding detainers or pending charges must be included. Indicate if there is a substance abuse history. Also, indicate if the inmate has successfully completed the institutional phase of the comprehensive drug treatment program. If more space is needed, attach an additional page.

12. Information on special needs of the individual and/or unusual circumstances is very important for staff in deciding on acceptance and setting up an individual program plan once the inmate is accepted. If staff wish to recommend a specific facility or program, they may include that information here. The CCM, in managing the CCC population, will consider the referenced special needs when establishing an acceptance date. Therefore, detailed and specific comments in this section are very helpful. If more space is needed, attach an additional page. Prenatal care needs should be addressed also.

Inmates who are <u>released</u> from institutions with a condition of parole, mandatory release, or supervised release that requires they reside in a CCC must be referred for CCC placement prior to their release. CCMs will notify institutions of acceptance or rejection.

13. For MINT referrals, indicate the expected date of delivery. and the projected date of the inmate's return to the parent institution.

●**INFORMATION TO BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM**:

A checklist is provided on the referral form to insure that all necessary material is included. CCMs who receive referrals without the required information or documents are instructed to hold the referral in abeyance until they are able to obtain the information from the institution.

**Referral Form**
All items shall be completed. Do not indicate "See progress report".

```
                                                        PS 7310.04
                                                          12/16/98
                                             Attachment B, Page 5
```

**Current Progress Report**
A current progress report (less than 180 days old at time of referral), including any significant new information that is available since the report was written, must be included with the referral. Especially important is specific information regarding proposed residence and employment (including telephone numbers), availability of other community resources, and any other information regarding release plans.

**Presentence Investigation/Violation Report**
Two copies of all relevant presentence investigation/violation report(s).

**Community Based Program Agreement**
This form allows facility staff to discuss the referral with family, potential employers, and other community resources and notifies the inmate of any special conditions of CCC residence such as financial responsibility and urinalysis. This form also acknowledges the inmate's agreement to comply with the rules and regulations of the Home Confinement program and stipulates that participation in home confinement may be an alternative to placement in a Community Corrections Center. Additionally, for MINT referrals, it notifies the inmate or the guardian/foster care provider of their responsibility for medical care and subsistence of the child while in a community based program.

**BP-339 CIM Case Information Summary**
This document is required for all CIM assignments except for "pure" separation cases.

**USPO Acceptance Letter**
If an inmate is releasing to a district other than the sentencing district, a relocation acceptance letter from the appropriate USPO must be included in the referral packet.

**Copy of Latest Parole Commission Notice of Action**
Provide the most current copy which includes <u>specific action</u>, such as the presumptive parole date, effective parole date, continue to expiration, etc.

**BP-351 Medical Evaluation for Transfer of Inmates to CCC Type Facility**
Must be completed prior to the referral in order to advise the facility of potential problems or special medical needs.

```
                                                      PS 7310.04
                                                      12/16/98
                                            Attachment B, Page 6
```

**Judgment and Commitment Order**
Serves as documentation of authority to maintain custody and identifies special commitment conditions.  If necessary, this document can be provided to the U.S. Marshals Service for purposes of apprehension or maintaining custody.

**Statement of Responsibility (MINT Referrals)**
For MINT referrals, this serves to notify the CCM, CCC, and institution staff of who will assume custody and total financial responsibility for the child.

●**INFORMATION TO BE FORWARDED TO THE TRANSITIONAL SERVICES MANAGER**:

Information should be forwarded to the TSM in the region where the inmate is releasing.  Staff are to refer to the Drug Abuse

Programs Manual, Inmate for additional information for responsibilities/documentation.

**Treatment Summary and Referral Form - Drug Abuse Treatment Programs**

This form provides assessment findings, treatment progress and other pertinent information for inmates who are graduates of Residential Drug Abuse Programs.

**Agreement to Participate in Community Transition Programming**
By signing this form, the inmate acknowledges that he/she understands and agrees to comply with program rules and regulations of the Bureau's community-based drug programs.

**Progress Report**
Refer to summary provided in "Current Progress Report" for INFORMATION TO BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM.

**Referral Form**
Refer to summary provided in "Referral Form" for INFORMATION TO BE INCLUDED IN THE CCC REFERRAL PACKET TO CCM.

**OTHER INFORMATION**

Any information or documents believed to be necessary to assist in the pre-release planning process.  A current psychological report should be included if it is anticipated the inmate will have mental health needs.

```
                                                           PS 7310.04
                                                            12/16/98
                                                 Attachment B, Page 7
```

Correspondence from/to family, friends, prospective employers, probation officers, etc., that may provide specific information about release plans and resources. A copy of the referral form is sent to the CUSPO in the sentencing district and the district of supervision. Other pertinent documents will have already been sent by the institution to these offices.

<u>Procedures</u>

For inmates being referred to contract facilities, the CCM will forward the referral to the appropriate facility, with instructions for the facility director to reply to the CCM with a copy to the referring institution. In addition to the transfer date, the facilities letter of acceptance will usually include documents for the inmate to sign and return prior to transfer. Such documents should be returned to the CCC by institution staff with the BP-385(51), transfer order and furlough papers.

The CCM maintains a copy of the referral for reference, should any questions arise from the facility, USPO, inmate's family or the institution.

Using institution records, unit staff will complete as much information as they can on release paperwork. Only the "unknowns" which must be determined while the inmate is in the CCC will be left blank. Inmates do not sign release papers (acknowledging they understand supervision conditions) and institution staff do not sign "certifying release" prior to an inmate's transfer. These certifications are done by CCC staff at the time of an inmate's release.

The institution is responsible for typing all information on release certificates. The line "now confined in the" shall specify the name of the CCC from which the inmate is to be released.

The inmate should sign the space at the bottom of the release certificate indicating an understanding of the conditions of release before departure from the CCC. The CCC Director is to sign the bottom portion of the form as the Chief Executive Officer verifying the inmate's release.

```
                                                            PS 7310.04
                                                              12/16/98
                                                          Attachment C
```

Please refer to the latest issuance of BOPDOCS for a copy of BP-S434.073 **COMMUNITY BASED PROGRAM AGREEMENT**.

```
                                                   PS 7310.04
                                                    12/16/98
                                                  Attachment D
```

Sample Statement of Responsibility for MINT Referral

Name
Address
City, State   Zipcode

RE:  DOE, Jane
     12345-678

Dear _____:

    Jane Doe, an inmate currently confined at the Federal Correctional Institution, ____(city)____, __(state)__, has been accepted into the Mothers and Infants Together (MINT) Program and is tentatively scheduled to furlough transfer to __(name of facility)__, ___(address)___, on _____.  She has an anticipated delivery date of _____.

    Ms. Doe advises that you, the father of the baby, will assume custody of the child, to include financial responsibility for medical care costs upon her release from the MINT Program. She indicated that your telephone number is _____.

    Accordingly, by signing this letter, you agree to assume custody of the child, including financial responsibility for medical care costs once Ms. Doe is released from the MINT Program.

    Please return this letter to the inmate's case manager, _____.  If there are any questions or concerns, please do not hesitate to contact me at __(full phone number)__.

                                      Sincerely,


                                      XXXXX
                                      Unit Manager


_____     _____
Signature of person assuming care and financial   Date
responsibility for Ms. Doe's baby / relationship
to inmate



cc:  CCM
     CCC
     HSA
     Controller
     Central File

# EXHIBIT 7

# BUREAU OF PRISONS PRACTICE OF PLACING IN COMMUNITY CONFINEMENT CERTAIN OFFENDERS WHO HAVE RECEIVED SENTENCES OF IMPRISONMENT

*When an offender has received a sentence of imprisonment, the Bureau of Prisons does not have general authority, either upon the recommendation of the sentencing judge or otherwise, to place such an offender in community confinement at the outset of his sentence or to transfer him from prison to community confinement at any time BOP chooses during the course of his sentence.*

December 13, 2002

### MEMORANDUM OPINION FOR THE DEPUTY ATTORNEY GENERAL

Your office has informed us that when a federal offender whom the Bureau of Prisons ("BOP") deems to be low-risk and nonviolent receives a short sentence of imprisonment, BOP often places that offender in a community corrections center, halfway house, or other form of "community confinement," rather than in prison. Your office has asked us to advise you whether BOP has general authority, either upon the recommendation of the sentencing judge or otherwise, to place such an offender directly in community confinement at the outset of his sentence or to transfer him from prison to community confinement during the course of his sentence.

We conclude below that BOP has no such general authority. As we explain, BOP's statutory authority to implement sentences of imprisonment must be construed, wherever possible, to comport with the legal requirements that govern the federal courts' sentencing orders. Community confinement does not constitute imprisonment for purposes of a sentencing order, and BOP lacks clear general statutory authority to place in community confinement an offender who has been sentenced to a term of imprisonment. BOP's practice is therefore unlawful.

### I.

We begin by examining whether federal courts have authority under the Sentencing Guidelines to order that the types of sentences at issue here be satisfied by community confinement.

### A.

The authority to sentence federal offenders to terms of imprisonment rests with the federal courts under the provisions of the Federal Criminal Code and the Sentencing Guidelines promulgated thereunder. *See* 18 U.S.C. §§ 3553, 3581-3582 (2000); *Williams v. United States*, 503 U.S. 193, 200-01 (1992). The Sentencing Guidelines were promulgated by the U.S. Sentencing Commission pursuant to the mandate of the Sentencing Reform Act of 1984, which sought to eliminate arbitrary discrepancies in federal sentencing.[(1)] Subject to the court's authority to depart from Guideline sentencing ranges when certain criteria are satisfied, *see* 18 U.S.C. § 3553(b), federal courts are bound by the provisions of the Sentencing Guidelines when they impose sentences on federal offenders. *See Koon v. United States*, 518 U.S. 81, 92 (1996); *Stinson v. United States*, 508 U.S. 36, 42 (1993).

The Sentencing Guidelines contain base offense levels of increasing severity (from level 1 to level 43), depending upon the seriousness of the offense and the characteristics of the offender with respect to specified criteria. The sentencing ranges applicable to the respective offense levels are set forth in a Sentencing Table that is published with the Guidelines. The Sentencing Table is divided into four different Zones, ranging from Zone A (for the shortest sentences) to Zone D (for the most severe sentences).

The BOP practice at issue here applies to Zone C and Zone D sentences. Zone C encompasses base offense levels 11 and 12 which, in the case of offenses falling into Criminal History Category I (the most favorable criminal history category), establish sentencing ranges of 8 to 14 months of imprisonment and 10 to 16 months of imprisonment, respectively. Zone D demarcates permissible sentences for base offense levels 13 through 43 and, again assuming

BUREAU OF PRISONS PRACTICE OF PLACING IN CCC'S WHO HAVE RECEIVED SENTENCES OF IMPRISONMENT file://N|/GHenderson/Sloane/bopimprisonment2.ht...

Case 4:04-cv-40075-DPW   Document 7-5   Filed 06/03/2004   Page 9 of 19

Criminal History Category I, provides for a sentencing range of 12 to 18 months of imprisonment for offense level 13, and up to life imprisonment for offense level 43.[(2)]

For Zone C sentences, section 5C1.1(d) of the Guidelines provides that the minimum term may be satisfied either by a simple "sentence of imprisonment," U.S. Sentencing Guidelines Manual § 5C1.1(d)(1), or by a "sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention," *id.* § 5C1.1(d)(2). In the latter case (sometimes referred to as a "split sentence"), section 5C1.1(d) requires "that at least one-half of the minimum term [be] satisfied by imprisonment." *Id.* The Guidelines state that "community confinement" "means residence in a community treatment center, halfway house, restitution center, mental health facility, alcohol or drug rehabilitation center, or other community facility; and participation in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility-approved programs during non-residential hours." *Id.* § 5F1.1, Application Note 1.

For Zone D sentences, section 5C1.1(f) requires that the minimum term be satisfied by a simple sentence of imprisonment. U.S.S.G. § 5C1.1(f).

### B.

By its plain terms, section 5C1.1 provides only limited authority to a federal court to order that a Zone C sentence of imprisonment be satisfied by community confinement. In particular, it provides only that a federal court may impose a Zone C split sentence under which the sentence of imprisonment "includes a term of supervised release with a condition that substitutes community confinement or home detention . . . , provided that at least one-half of the minimum term is satisfied by imprisonment." U.S.S.G. § 5C1.1(d)(2). With respect to Zone C or Zone D simple sentences of imprisonment, section 5C1.1 provides no authority to substitute community confinement for any portion of the sentence.

Consistent with the plain meaning of section 5C1.1, the federal courts of appeals have uniformly determined that community confinement does not constitute "imprisonment" for purposes of satisfying either the requirement under that section that "at least one-half of the minimum term [of a Zone C split sentence] be satisfied by imprisonment" or the requirement that a Zone C or Zone D simple sentence be a "sentence of imprisonment." In the words of the Second Circuit, "'Imprisonment' and 'community confinement' are not synonyms. 'Imprisonment is the condition of being removed from the community and placed in prison, whereas 'community confinement' is the condition of being controlled and restricted within the community." *United States v. Adler*, 52 F.3d 20, 21 (2d Cir. 1995). The Seventh Circuit has likewise stated that section 5C1.1 "plainly draws a distinction between 'imprisonment' and either community confinement or home detention" and that this distinction "is consistent with the plain meaning of the term 'imprisonment.'" *United States v. Swigert*, 18 F.3d 443, 445 (7th Cir. 1994). *See also United States v. Voda*, 994 F.2d 149, 152 (5th Cir. 1993) (stating, in construing Guidelines provision governing Zone B sentence of probation, that "a community corrections facility is not a jail"); *United States v. Latimer*, 991 F.2d 1509, 1513 (9th Cir. 1993) (stating, in construing Guidelines provision governing criminal history, that "the division between imprisonment and community treatment center confinement is emphasized again in § 5C1.1").[(3)]

In *United States v. Serafini*, 233 F.3d 758 (3rd Cir. 2000), the Third Circuit opined that where the district court had imposed on the defendant a Zone C 10-month split sentence, consisting of five months of imprisonment and five months of house arrest, the district court would violate the Guidelines if it ordered that the defendant serve the five months of imprisonment in community confinement. *Id.* at 762 n.2, 777-778. Determining that the district court had merely recommended (rather than ordered) community confinement, the Third Circuit stated that BOP would violate the Guidelines if it followed the district court's recommendation. *Id.* at 778. It further emphasized that "a district court has *no* power to *dictate* or *impose* any place of confinement for the imprisonment portion of the sentence." *Id.* at 778 n.23 (emphasis in original). Similarly, the Sixth Circuit ruled that where the district court had sentenced a defendant "to be imprisoned for a term of ten months," the district court could not substitute community confinement for imprisonment. *United States v. Jalili*, 925 F.2d 889, 892-893 (6th Cir. 1991). Language in the court's order purporting to make this substitution was instead to be "stricken from the order as mere surplusage." *Id.* at 893.[(4)]

In sum, it is clear that federal courts violate the Guidelines if they order (1) that an offender sentenced to a Zone C or Zone D simple sentence of imprisonment serve his sentence in community confinement, or (2) that an offender sentenced to a Zone C split sentence serve the imprisonment portion of his sentence in community confinement.

## II.

Having determined that a federal court violates the Guidelines if it orders that a sentence of imprisonment be satisfied by community confinement, we now address whether BOP, either on its own initiative or in response to a federal court recommendation, has general authority to implement a Zone C or Zone D sentence of imprisonment by placing an offender in community confinement.

## A.

The Sentencing Reform Act of 1984 not only authorized the Sentencing Guidelines; it also rewrote the provisions governing BOP's implementation of sentences.[5] Under section 3621 of title 18, BOP is responsible for administering the sentences of imprisonment that federal courts impose on federal offenders:

> (a) COMMITMENT TO CUSTODY OF BUREAU OF PRISONS.--A person who has been sentenced to a term of imprisonment pursuant to the provisions of subchapter D of chapter 227 shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, or until earlier released for satisfactory behavior pursuant to the provisions of section 3624.
>
> (b) PLACE OF IMPRISONMENT.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets the minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering--
>
> (1) the resources of the facility contemplated;
>
> (2) the nature and circumstances of the offense;
>
> (3) the history and characteristics of the prisoner;
>
> (4) any statement made by the court that imposed the sentence--
>
> > (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
> >
> > (B) recommending a type of penal or correctional facility as appropriate; and
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621 (2000). In addition, section 3622 authorizes BOP to "release a prisoner from the place of his imprisonment for a limited period" under specified conditions for purposes that include employment, training, and education. *Id.* § 3622. Section 3624(c) further provides that BOP "shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community." 18 U.S.C. § 3624(c) (2000). It also specifies that "home confinement" may be used for this purpose. *See id.*

## B.

BUREAU OF PRISONS PRACTICE OF PLACING IN CCC... HO HAVE RECEIVED SENTENCES OF IMPRISONMENT    file:///N|/GHenderson/Sloane/bopimprisonment2.htm

Case 4:04-cv-40075-DPW    Document 7-5    Filed 06/03/2004    Page 11 of 19

Both BOP's authority under title 18 to implement sentences of imprisonment and the federal courts' sentencing authority under the Guidelines were conferred by the Sentencing Reform Act of 1984. It is therefore especially appropriate that they be construed to produce a harmonious interpretation. *See, e.g., Reno v. Koray*, 515 U.S. 50, 56-57 (1995). Because BOP is merely administering the sentences of imprisonment that the federal courts impose pursuant to the Guidelines, we believe that BOP's authority must be construed, wherever possible, to comport with the legal requirements that govern the sentencing orders. Construing BOP's authority in this way will also promote Congress's objective of eliminating arbitrary disparities in punishment between offenders convicted of the same offense. *See supra* pp. 1-2 & n.1.

We recognize that there are certain provisions governing BOP's implementation of sentences of imprisonment that clearly authorize a sentence to be implemented other than according to its seemingly plain terms. In such cases, the rule of construction described above does not come into play because there is no conflict to be resolved. Rather, a harmonious interpretation is achieved in such cases by understanding the sentence to be read in light of, and therefore to incorporate implicitly, the clear statutory provision. For example, section 3621(a) specifies that an offender "who has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons until the expiration of the term imposed, *or until earlier released for satisfactory behavior pursuant to the provisions of section 3624*," 18 U.S.C. § 3621(a) (emphasis added). Section 3624(a) in turn provides that a "prisoner shall be released by the Bureau of Prisons on the date of the expiration of the prisoner's term of imprisonment, *less any time credited toward the service of the prisoner's sentence*" for satisfactory behavior, *id.* § 3624(a) (emphasis added). In light of this clear statutory command, we have no doubt that a sentence imposed under the Sentencing Guidelines must be read as being subject to the command. Thus, where a prisoner serving a three-year sentence of imprisonment has received ten days' credit for satisfactory behavior, BOP, in administering the sentence, must release the offender ten days before the three-year period runs.

The question for us here, then, is whether BOP has clearly been given statutory authority to implement Zone C or Zone D simple sentences of imprisonment, or to implement the imprisonment portion of a Zone C split sentence, by placing an offender in community confinement. BOP has pointed to sections 3621(b) and 3622 as possible sources of authority. We address these in turn.

Nothing in section 3621(b) provides BOP clear authority to place in community confinement an offender who has been sentenced to a term of imprisonment. It is true that section 3621(b) gives BOP broad discretion to designate as "the place of the prisoner's imprisonment" "any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable." But the authority to select the *place* of imprisonment is not the same as the authority to decide *whether* the offender will be imprisoned. Under the statutory scheme, the latter authority lies solely with the court (subject to the requirements imposed by the Sentencing Guidelines), and section 3621(b) does not authorize BOP to subvert that statutory scheme by placing in community confinement an offender who has received a sentence of imprisonment. Thus, even if we were to conclude that a community corrections center or halfway house could qualify as "the place of the prisoner's imprisonment" for purposes of this section, we would not read this general conferral of authority as speaking at all to -- much less clearly trumping -- the requirement under the Guidelines that community confinement not be used to satisfy a Zone C or Zone D simple sentence of imprisonment or the imprisonment portion of a Zone C split sentence. Moreover, if section 3621(b) were read to confer on BOP unfettered discretion to have offenders serve sentences of imprisonment in community confinement, then the time limitation in section 3624(c) on BOP authority to transfer a prisoner to a non-prison site -- i.e., for a period, not to exceed six months, of the last 10% of the term of his sentence -- would be rendered null with respect to community confinement.[6]

In addition, consistent with the federal courts of appeals' reading of section 5C1.1, *see supra* p. 3, we do not believe that a community corrections center or halfway house is a "place of . . . imprisonment" within the ordinary meaning of that phrase. As we understand it, residents of a community corrections center or halfway house, although still in federal custody, are generally not confined to the facility throughout the day but are instead able to pursue outside employment, training, and education.[7] Indeed, as we understand BOP's policy statement on community corrections centers ("CCCs"), inmates placed in CCCs normally become eligible for weekend and evening leave passes after the second week of confinement. BOP PS 7310.04, Community Corrections Center (CCC) Utilization and Transfer Procedure, ¶ 7.a(1)-(2) (Dec. 16, 1998), *available at* http://www.bop.gov/progstat/7310_04.html. Reading section 3621(b) as a whole, therefore,

we understand the discretion afforded to BOP, under the second sentence, to "designate any available penal or correctional facility that meets minimum standards of health and habitability . . . [and] that [BOP] determines to be appropriate and suitable" to be constrained by the requirement in the first sentence that such facility be a place of imprisonment.[(8)]

We acknowledge that section 3621(b)(4)(B) provides specifically that BOP may consider, in determining which penal or correctional facility to designate, a judicial statement "recommending a type of penal or correctional facility as appropriate." But any contention that this provision clearly indicates that BOP has authority to have an offender serve a sentence of imprisonment in community confinement depends on two mistaken premises -- the premise that there are not various types of places of imprisonment, *but see* 28 C.F.R. § 500.1(d) (listing various types), and the premise that BOP is required to give effect to a judicial recommendation.

Section 3622, which provides for temporary release of prisoners, likewise does not provide clear authority to support BOP's practice. In particular, each of the subparts of section 3622 presupposes that an offender is in a "place of . . . imprisonment," and none authorizes extended placement of a prisoner in community confinement. Subsection 3622(a) permits release of a prisoner for no more than 30 days for various purposes, including attending to important family matters (e.g., attending a funeral or visiting a dying relative), obtaining medical treatment, or contacting a prospective employer. Subsection 3622(b), in authorizing the release of a prisoner to "participate in a training or educational program in the community," provides that the prisoner shall "*continu[e]* in official detention at the prison facility." And subsection 3622(c) provides that a prisoner who obtains temporary release for purposes of "paid employment," shall "*continu[e]* in official detention at the penal or correctional facility."

We therefore conclude that the BOP practice is not lawful.

\* \* \*

In sum: When a federal offender receives a Zone C or Zone D sentence of imprisonment, section 3621 and section 3622 of title 18 do not give BOP general authority to place the offender in community confinement from the outset of his sentence. Nor do they give BOP general authority to transfer him from prison to community confinement at any time BOP chooses during the course of his sentence.

M. Edward Whelan III
Principal Deputy Assistant Attorney General
Office of Legal Counsel

1. *See* Pub. L. No. 98-473, Title II, Ch. II, § 217, 98 Stat. 1837, 2017 (1984), reprinted in 1984 U.S.C.C.A.N. 1837, 2017.

2. United States Sentencing Commission, *Guidelines Manual*, Sentencing Table (Nov. 2001).

3. Contrary to *Latimer* and *United States v. Pielago*, 135 F.3d 703, 711-713 (11th Cir. 1998), the Sixth Circuit in *United States v. Rasco*, 963 F.2d 132 (6th Cir. 1992), ruled that, for purposes of the Guidelines provision governing criminal history, detention in a halfway house or community treatment center constitutes "being incarcerated." The Sixth Circuit made clear, however, that its ruling had no application to section 5C1.1. *See id.* at 137.

4. The Sixth Circuit did rule in *United States v. Strozier*, 940 F.2d 985 (6th Cir. 1991), that, for purposes of a Guidelines provision requiring that a court "order a term of supervised release to follow imprisonment when a sentence of imprisonment of more than one year is imposed," the period of community confinement should be included in determining the length of the sentence of imprisonment. Both the Sixth and Seventh Circuits have determined, however, that that ruling on a separate Guidelines provision should not guide the meaning of section 5C1.1. *See Rasco*, 963 F.2d at 137; *Swigert*, 18 F.3d at 446.

5. *See* Pub. L. No. 98-473, Title II, Ch. II, §§ 212, 217, 98 Stat. 1837, 1987, 2007, 2017 (1984).

6. Your office has advised us that BOP, in exercising its authority under section 3624(c), has sometimes not abided by the

BUREAU OF PRISONS PRACTICE OF PLACING IN COMMUNITY CONFINEMENT...HAVE RECEIVED SENTENCES OF IMPRISONMENT file:///N|/Ghenderson/Sloand/bopimprisonment2.ht...

Case 4:04-cv-40075-DPW   Document 7-5   Filed 06/03/2004   Page 13 of 19

time limitation set forth in that section. The authority conferred under section 3624(c) to transfer a prisoner to a non-prison site is clearly limited to a period "not to exceed six months, of the last 10 per centum of the term to be served," 18 U.S.C. § 3624, and we see no basis for disregarding this time limitation.

7. *See, e.g., Bailor v. Salvation Army*, 51 F.3d 678, 683 (7th Cir. 1995) (describing freedom of residents of halfway house); *United States v. Chavez*, 204 F.3d 1305, 1315 (11th Cir. 2000) ("We have previously held that confinement to a halfway house at night with the requirement that a defendant work at a job or seek employment during the day is a liberty 'markedly different from custodial incarceration in a penitentiary.'" (citing *Dawson v. Scott*, 50 F.3d 884, 888 (11th Cir. 1995)); *United States v. Dighera*, 185 F.3d 875 (Table), 1999 WL 390870, at *2 (10th Cir. June 15, 1999) ("We have previously distinguished sentences involving physical confinement, such as incarceration at a prison camp, from non-secured custody such as placement at a halfway house."); *Richardson v. Steffa*, 105 F.3d 669 (Table), 1997 WL 10964, at *1 (10th Cir. Jan. 14, 1997) ("under the community corrections program, [plaintiff] was able to work in the Denver community at good jobs, travel about the community unescorted, and maintain business and social contacts").

8. We assume *arguendo* that a community corrections center, halfway house, or other form of community confinement may constitute a "penal or correctional facility" under the provisions of 18 U.S.C. § 3621(b). We note, however, that that term is not defined. In a 1992 opinion in which we concluded that BOP has authority under section 3621 to contract with the private sector for the operation of secure facilities, we declined to draw a distinction between residential community facilities and secure facilities with respect to BOP's contracting-out authority. *See Statutory Authority to Contract with the Private Sector for Secure Facilities*, 16 Op. O.L.C. 65, 70-71 (1992). That opinion, however, did not address the distinct question whether a community corrections center constitutes a "place of imprisonment" under section 3621, nor did it have occasion to consider the line of cases discussed in Part I.B, *supra*, holding that community confinement does not constitute imprisonment.

# EXHIBIT 8



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Washington, D.C. 20534*
December 20, 2002

MEMORANDUM FOR CHIEF EXECUTIVE OFFICERS

FROM:  /s/
       Michael B. Cooksey, Assistant Director
       Correctional Programs Division


       /s/
       Christopher Erlewine
       Assistant Director/General Counsel

SUBJECT:   Community Confinement Procedure Changes

   This memorandum informs you of procedure changes related to the Bureau's designation of inmates to community correction centers (CCC) to serve terms of imprisonment. These procedure changes are the result of a recent legal opinion issued by the U.S. Department of Justice, Office of Legal Counsel (OLC), which analyzes the Bureau's statutory authority to designate inmates to CCCs as more limited than we have previously practiced. A copy of the OLC opinion is included with this memorandum.

   **This memorandum should be distributed to all staff who are affected by the procedure changes.**

   For further implementation assistance, please contact Stew Rowles, Community Corrections Administrator, at
, or J.Paul Horner, Administrator, Correctional Programs Branch,
         . For staff legal assistance, please contact your Regional Counsel. Advise inmates wishing to challenge any aspect of this revised procedure to do so through the Bureau's administrative remedy program.

**THE BUREAU'S CCC DESIGNATION AUTHORITY DEFINED**

Effective immediately, the Bureau's CCC designation authority is defined as follows:

(1) **The Bureau will no longer accommodate judicial recommendations for direct CCC placement of inmates sentenced to terms of imprisonment** (hereinafter referred to as "direct-court placement inmates"). Rather, all inmates serving terms of imprisonment must be designated by the Bureau to prison or jail facilities. This prohibition applies to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau; and

(2) **Pre-release programming CCC designations are limited in duration to the last 10% of the prison sentence, not to exceed six months.** This limitation, and the following two exceptions, apply to all U.S. Code and D.C. Code offenders whose prison sentences are administered by the Bureau:

- Inmates completing the Residential Drug Abuse Program (RDAP) may exceed the 10% limitation, but are still limited to a maximum six-months pre-release CCC designation; and

- Inmates completing an Intensive Confinement Center (ICC) program may exceed both the 10% and six-months limitations, at this time. The OLC opinion's impact on this issue is still being reviewed, and further guidance will be forthcoming.

**IMPLEMENTATION PROCEDURES**

There are three phases to implementing these procedure changes. First, some direct-court placement inmates must be promptly re-designated to prison or jail facilities depending on the amount of time left to serve on their prison terms. Second, future pre-release CCC designation cases must be immediately reviewed to ensure compliance with this revised procedure before the inmates depart their parent institution. Third, female inmates participating in the Mothers and Infants Nurturing Together (MINT) program will be authorized by furloughs rather than CCC designations.

**Re-Designation of Direct-Court Placement Inmates.**

Direct-court placement inmates who, as of December 16, 2002, had more than 150 days left to serve on their prison sentences, must be re-designated to prison or jail facilities. This calculation results in a date of May 15, 2003. **Accordingly, direct-court placement inmates who, as of December 16, 2002, had a projected release date of May 15, 2003, or later, must be re-designated to prison or jail facilities.**

Rosters identifying these inmates are attached. However, each community corrections office (CCO) needs to thoroughly review the direct-court placement inmate population to ensure compliance with this directive. CCO staff will need to closely review each identified case to ensure that the individual inmate is actually residing in a CCC, rather than a prison or jail facility, and if so, to determine the appropriate transfer method to the re-designated facility. CCOs should work closely with Regional Designators to secure placement at the nearest appropriate facility.

Also, when re-designating direct-court placement inmates to prison or jail facilities:

(1) Notify the sentencing judge of the inmate's re-designation. A sample letter for your use is included with this memorandum; and

(2) Provide the inmate written notice of the re-designation at least 30 days prior to being transferred. A sample memorandum for your use is included with this memorandum. At least 30 days must pass between the date the inmate receives the written notice, and the actual transfer.

**Pre-Release CCC Inmates.**

The individual cases of all inmates being considered for pre-release CCC placement must be immediately reviewed for compliance with this revised procedure. Inmates who, at the time of record review by Bureau staff pursuant to this memorandum, have not yet departed their parent institutions en route to the CCC, must have their pre-release CCC designation plan adjusted accordingly to comply with this revised procedure, i.e., limited in duration to the last 10% of the prison sentence, not to exceed six months.

**MINT Program Participants.**

Female inmates participating in the MINT program are affected by the new limits placed on CCC designations. Consequently, the authority and procedures for MINT program participants are modified as follows.

The Bureau will now rely on its statutory furlough authority, 18 U.S.C. §§ 3622(a)(5), to facilitate MINT program participation. Under this authority, the Bureau may release a prisoner from the place of imprisonment for a period not to exceed 30 days for the purpose of establishing, or re-establishing, family or community ties. In order to facilitate these furloughs, every MINT program inmate must be initially designated to a Bureau institution from which to be furloughed to a MINT program.

Additionally, because MINT program participation under the furlough authority is limited to 30 day periods, the Warden of an inmate's parent institution must re-assess the need for such programming every 30 days. If deemed appropriate, the Warden of the parent institution may renew the inmate's MINT program participation for an additional 30 day period. This process may be repeated as often as necessary to fulfill the inmate's MINT program objectives, and must be determined on an individual basis.

Further guidance for MINT program participants will be forthcoming. In the interim, specific questions should be directed to Valerie Martin, Administrator, Special Needs Offender Program, at            .

## FREQUENTLY ASKED QUESTIONS

The following are anticipated questions and answers related to this revised procedure.

***How are inmates participating in RDAP affected by these revised procedures?***

All inmates who successfully complete the unit-based RDAP are still able to receive a six-months CCC placement. The 10% limitation does not apply to this group of inmates, regardless of early release eligibility status. Accordingly, the policy and current practice of recommending up to 180 days CCC placement for RDAP graduates (both 3621(e) eligible and ineligible) remains the same. Central Office review of all early release cases is also unaffected.

- 4 -

***What if the media asks questions about this revised procedure?***

Inquiries from the media regarding any aspect of this revised procedure should be referred to the Bureau's Office of Public Affairs, Central Office, at (202) 307-3198.