IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DAVID SLOANE,
    Petitioner

    v.

DAVID L. WINN,
    Respondent

:
:
:
:
:
:
:
:

No. 04-40075

TRAVERSE

NOW COMES Petitioner, David Sloane, pro se, and respectfully files this Traverse in response to the Memorandum of Respondent David L. Winn in Opposition to Petitioner's Request for Relief and in Support of Motion to Dismiss. Respondent's arguments will be addressed in the order in which they were presented, and Petitioner believes that it will become apparent that said arguments involve incorrect interpretation and/or application of both statutory and case law.

### TABLE OF CONTENTS

| | |
|---|---|
| Table of Authorities | ii |
| Analysis of Respondent's Arguments | 1 |
|     Calculation of good conduct time | 1 |
|     Determination of CCC/Home Confinement Placement Date | 6 |
| Conclusion | 13 |
| Certificate of Service | 14 |
| Exhibit 1 | 15 |

i

TABLE OF AUTHORITIES

Cases cited

| Atlantic Cleaners & Dyers v. United States | 4 |
|---|---|
| Brown v. Hemingway | 6 |
| Chevron U.S.A. Inc. v. Natural Resources Defense Council | 5 |
| Conroy v. Ansikoff | 11 |
| Dominique v. Weld | 12 |
| Gammon v. Winn | 8 |
| Goldings v. Winn | 8 |
| Guitard v. United States Secretary of Navy | 1 |
| Helvering v. Stockholmes Enskilda Bank | 4 |
| Iacaboni v. United States | 6, 7, 10, 13 |
| Kennedy v. Winn | 8 |
| K mart Corp v. Cartier, Inc. | 3 |
| Landgraf v. USI Film Prods. | 11 |
| Mallory v. United States | 7, 12, 13 |
| Monahan v. Winn | passim |
| Morrissey v. Brewer | 13 |
| Pacheco-Camacho v. Hood | 5 |
| Pasciuti v. Drew | 6 |
| Reno v. Koray | 9 |
| Rothberg v. Winn | 8 |
| Sandin v. Conner | 13 |
| Sorenson v. Secretary of Treasury | 4 |
| Sullivan v. Stroop | 3 |
| Turano v. Winn | 8 |

United States v. Mikutowicz                                    8

United States v. Serpa                                         7

Von Hoffburg v. Alexander                                      2

Weaver v. Graham                                              12

Williams v. Lamanna                                           6

Young v. Harper                                              13

Zuber v. Allen                                               11

Zucker v. Menifee                                             1


Statutes cited

5 U.S.C. § 553                                               12

18 U.S.C. 3621                                               12

18 U.S.C. § 3624                                          passim

18 U.S.C. § 3625                                             12

28 C.F.R. § 523.20                                            2

28 C.F.R. § 2241                                              1

United States Constitution                                 2, 6


BOP Program Statements cited

5100.07                                                      9

5880.28                                                   2, 3

ANALYSIS OF RESPONDENT'S ARGUMENTS

Petitioner takes note of the fact that the numbering sequence used by Respondent in his Memorandum (hereinafter referred to as "RM") is not consistent throughout the document. Therefore, in the interest of clarity, these arguments will be addressed by page number, rather than by section.

Calculation of good conduct time

Respondent's attempt to refute Petitioner's assertion that the BOP method of calculation is incorrect understandably begins with an assertion that Petitioner's claim should be dismissed because of a "traditional requirement" that administrative remedies must be exhausted before applying for habeas relief under 28 U.S.C. § 2241. (RM at 3, n.3.)[1] While Petitioner acknowledges that the exhaustion requirement vis-a-vis the calculation of good conduct time has yet to be litigated, the issue has been uncontrovertibly determined with regard to the Community Corrections Center (CCC) placement question. In the latter issue, Respondent has already been told by the court that "the statutory PLRA exhaustion requirement does not apply." Monahan v. Winn, 276 F.Supp.2d 196 (D.Mass.2003)(Gertner, J.). In his initial Memorandum, Petitioner not only cited Judge Gertner's compelling holding in this matter, but also presented the detailed analysis found in Zucker v. Menifee, 03 Civ. 10077 (RJH)(S.D.N.Y.2004) which, in turn, applied the four-pronged test elaborated in Guitard v. United States

---

[1] Respondent also attempts, in the same footnote, to argue that the same requirement should be used to dismiss Petitioner's challenge to the CCC placement policy. As noted above, that issue has been well refuted by the courts.

1

Secretary of Navy, 967 F.@d 737, 741 (2d Cir. 1991) (citing
Von Hoffburg v. Alexander, 615 F.2d 633, 638 (5th Cir. 1980),
and cases cited therein).

   Petitioner respectfully suggests that, in the instant case,
all four conditions are met.  Since, as in the matter of CCC
placement, Respondent's calculation of Petitioner's GCT credit is
based on a BOP policy, any appeal within the BOP administrative
process cannot be expected to provide a "genuine opportunity for
adequate relief," and consequentially, any such "administrative
appeal would be 'futile'."  Furthermore, with the arguable date of
Petitioner's transfer to CCC/Home Confinement placement being
August 23, 2004, pursuit of said remedies prior to seeking judicial
relief would clearly result in "irreparable injury."  Finally,
since the ultimate question here addresses the Department of
Juctice's interpretation of the good conduct time statute, it may
be reasoned that it is the province of the courts -- not the DOJ
-- to interpret statutory law, and any attempt to usurp that
function is a direct violation of the Separation of Powers among
the three branches of the government which is established in the
United States Constitution (compare Articles I, II and III).

   Petitioner therefore contends that it is "appropriate for
this Court to waive any and all questions of exhaustion of
administrative remedies and proceed immediately to the merits of
[the] Petition."  Petitioner's Memorandum (hereinafter "PM") at 9.

   Respondent then presents the statute (18 U.S.C. § 3624(b)),
the implementing BOP regulation (28 C.F.R. § 523.20), and the
BOP's internal guideline (Program Statement ("PS") 5880.28).  He
attempts to characterize the latter's convoluted mathematical

model for calculating GCT credit as "straight-forward in concept,
which would, if true, fit the Congressional intent to award good
time credit at an "easily determined rate."  Senate Report No. 98-
225, reprinted in 1984 U.S.C.C.A.N. at 3329-30.  However, the
Program Statement itself describes the calculation process as
"arithmetically complicated."  P.S. 5880.28 at 1-44.  Having
taught GED classes at both FCI-Fort Dix and FMC-Devens, Petitioner
can attest to the fact that the BOP's method of calculation far
exceeds the mathematical ability of the majority of Federal inmates.

    Respondent then proceeds to perpetuate the BOP's blatantly
erroneous misinterpretation of the statute.  Notably, he continues
to claim that the plain language of the statute supports this
contention.  Nothing could be further from the truth.

    First of all, it is incontrovertible that the statute employs
the phrase "term of imprisonment" no less than four[2] times, three
of which are in the first sentence.  In that same sentence, the
statute also employs the phrase "time served."  The BOP's attempt
to alter one of these instances to suit its own purpose flies in
the face of the Supreme Court:

> "'If the statute is clear and unambiguous "that is the
> end of the matter, for the court, as well as the agency
> must give effect to the unambiguously expressed intent
> of Congress." . . . In ascertaining the plain meaning
> of the statute, the court must look to the particular
> statutory language at issue, as well as the language
> and design of the statute as a whole.'" K mart Corp. v.
> Cartier, Inc., 486 U.S. 281, 291-292, 100 L.Ed.2d 313,
> 108 S.Ct. 1811 (1988)(internal citations omitted).

Sullivan v. Stroop, 496 U.S. 478, 110 L.Ed.2d. 438, 444,

110 S.Ct. 2499 (emphasis added).  The clear use of the phrase

---

[2]Actually, the phrase is used four times in § 3624(b)(1), once
in § 3624(a), once in § 3624(c), and once in § 3624(d), always
with the same meaning -- the length of the sentence imposed by
the court.

"term of imprisonment" is, to again quote the <u>Sullivan</u> court:

> ...a classic case for the application of the "normal
> rule of statutory construction that '"identical words
> used in different parts of the same act are intended
> to have the same meaning."'" <u>Sorenson v. Secretary of
> Treasury</u>, 475 U.S. 851, 860, 89 L.Ed.2d 855, 106 S.Ct.
> 1600 (1986)(quoting <u>Helvering v. Stockholmes Enskilda
> Bank</u>, 293 U.S. 84, 87, 79 L.Ed. 211, 55 S.Ct. 50 (1934)
> (in turn quoting <u>Atlantic Cleaners & Dyers, Inc. v.
> United States</u>, 286 U.S. 427, 433, 76 L.Ed. 1204, 52
> S.Ct. 607 (1932))).

<u>Id.</u> at U.S. 484, L.Ed.2d 446.

Having thusly ignored the Supreme Court's holding as it applies to the phrase "term of imprisonment," Respondent next attempts to pursue his flawed "plain language" argument by focusing on the phrase "<u>at the end</u> of each year of the prisoner's term of imprisonment." RM at 6 (quoting the statute, emphasis added by Respondent).  Petitioner respectfully suggests that this is another example of the BOP altering the meaning of simple English words to suit their own purpose.  The BOP has argued, and some courts have mistakenly agreed, that the phrase "at the end" implies that good conduct time credit cannot be applied until <u>after</u> the completion of a year of service.  This is simply wrong.

"At" does not mean "after."  The two prepositions have meanings that are clearly distinct.  "At" is "used as a function word to indicate presence or occurrence in, on, or near," while "after" means "behind in place ... subsequent to in time or order." <u>Merriam-Webster's Collegiate Dictionary</u>, 10th ed., 1999. The ludicrous nature of the BOP's meaning becomes evident when examining such phrases as "at the end of the day" (which does <u>not</u> mean "the following day") or "at the end of his life" (which obviously does <u>not</u> mean "after he dies").

4

It is perfectly clear that the phrase "at the end" is used in the statute to distinguish from "at the beginning." Clearly, Congress intended that the 15% of the imposed "term of imprisonment" that is to be credited for good conduct would follow the 85% which the prisoner was expected to serve. (Using the BOP method of calculation, the minimum that an exemplary prisoner must serve is 87.1% of his term of imprisonment, having received a GCT credit of only 12.9%.)

Petitioner further notes that Respondent has failed to properly consider the question of Congressional intent. He relies on the flawed logic in Pacheco-Camacho v. Hood, 272 F.3d 1266 (9th Cir.2001), cert. denied, 535 U.S. 1105 (2002). That court's argument was based on the erroneous conclusion that the statute was ambiguous, thus permitting them to allow the BOP to make a "permissible construction of the statute," citing the standard set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 (1984). However, the Chevron test is inappropriately applied, since the analysis presented above has clearly shown the statute's wording not to be ambiguous. Congress clearly delineated between the phrases "term of imprisonment" and "time served." If they meant "time served" as the basis for calculating GCT credit, they would have said "time served." They did not.[3]

Furthermore, Respondent totally ignores the most direct expression of Congressional intent -- the words of the author

_____

[3]It is worth noting that even Respondent uses the phrase "term of imprisonment" to refer to the sentence imposed on Petitioner. RM at 1 ("a term of imprisonment of 27 months.").

of the statute, Senator Joseph Biden -- as presented in Petitioner's
Memorandum. PM at 16.

Both sixth circuit cases cited by Respondent (Brown v.
Hemingway, 53 Fed. Appx. 338, 2002 WL 31845147 (6th Cir.2002)
and Williams v. Lamanna, 20 Fed. Appx. 360, 2001 WL 1136069 (6th
Cir. 2001)) are based on the blatantly incorrect position that the
statutory language is ambiguous, as does the completely incorrect
analysis in Pasciuti v. Drew, No. 9:04-cv-043 (LEK). As shown
above, there is absolutely no ambiguity in 18 U.S.C. § 3624(b),
nor is there any doubt as to Congressional intent. Pursuant to
the rules of statutory construction cited above, the BOP's cal-
culation of Petitioner's good conduct time credit is incorrect,
and Respondent should be required to provide the full 121.5 days
called for by the statute.


Determination of CCC/Home Confinement Placement Date

While it is understandable, if regretable, that Respondent
has attempted to rationalize the incorrect calculation of good
conduct time, the same cannot be said for his arguments regarding
the imposed limitation on CCC/Home Confinement placement. Respond-
ent was specifically and personally told by this court that (1)
the BOP policy in effect prior to December 2002 "was not and is
not, even remotely 'unlawful,'" (Monahan at 200, quoting Iacaboni
v. United States, 251 F.Supp.2d at 1017), (2) the BOP's adoption
of the policy change was improper under the Administrative Pro-
cedure Act (Monahan at 200, citing Iacaboni at 1018), (3) "the
retroactive application of this policy violates the Constitution"
(Monahan at 200, citing Iacaboni at 1040-43), and (4) "the BOP's

6

post-December 2002 policy with regard to community confinement
is legally invalid." (Monahan at 222).  In spite of that, he
rehashes the flawed arguments presented in Monahan and Iacaboni
as if those cases were merely contradictory opinions in another
circuit with no binding authority on him.  That, however, is
simply not the case here.

Petitioner will not insult the Court by repeating the elo-
quent analyses presented by Chief Judge Young in United States
v. Serpa, 251 F.Supp.2d 988 (D.Mass.2003), Judge Ponsor in
Iacaboni, Judge Gertner in Monahan, and Judge Woodlock in
Mallory v. United States, 2000 U.S. Dist. LEXIS 4522.  These
opinions all clearly demonstrate that the application of the new
BOP policy to petitioner is invalid and improper.  However, it
is necessary to specifically address a number of Respondent's
statements and incorrect conclusions.

Respondent acknowledges that the December 13, 2002, "OLC
Memorandum" by the Principal Deputy Assistant Attorney General
resulted in a policy change as documented in the "December 20,
2002, BOP Memorandum to BOP Chief Executive Officers."  RM at
9-10.  He then attempts to present a false distinction between
so-called "front-end" and "back-end" cases, suggesting that cases
favorable to Petitioner are of the former type, while the instant
case falles within the latter grouping.  However, in Monahan, the
court specifically addressed such a "back-end" situation involv-
ing an inmate at FMC-Devens (Julio Pereira) and held that "the
BOP's revised view, pursuant to the DAG Opinion, that it lacks
discretion to transfer offenders to community confinement for a

7

full six months (or, for that matter, at any time) at the end[4]
of their sentences is incorrect." Monahan at 203 (emphasis
added). Monahan also cites the case of Gammon v. Winn, No.
03-40127-NG, in which Gammon withdrew the action because his
delayed transfer to community confinement was already imminent.
Monahan at 203, n. 5.

Respondent then cites five cases in this district in which,
he claims, the legally invalid BOP policy was upheld. RM at 11.
However, Petitioner respectfully suggests that the cases in ques-
tion do no such thing. In Kennedy v. Winn, Civ. No. 03-10568-
MEL (D.Mass. July 9,2003), the court superficially concluded that
the central issue was a distinction between 18 U.S.C. § 3624(b)
and 18 U.S.C. § 3624(c), and then accepted the government's
assertion that §3624(c) served to limit the BOP's authority to
place an inmate in a CCC or on Home Confinement for more than
10% of his term of imprisonment. The same logic was followed in
Rothberg v. Winn, 03-CV-11308-RGS (D.Mass.2003), Goldings v.
Winn, Civ. No. 03-40161-WGY (D.Mass., Memorandum and Order dated
Oct. 23, 2003, appeal docketed, No. 03-2633 (1st Cir. argued
May 7, 2004)), and Turano v. Winn, Civ. No. 03-40188-EFH (D.
Mass., Order of Dismissal dated Jan.7, 2004).[5] However, this
distinction perpetuates a statutory misconstruction of the
language which has been thoroughly corrected in Monahan at 208-212.

---

[4]Note that Judge Gertner specifically used the phrase "at the end
of their sentence" with clear intention that she did not mean "at
the end.
[5]Respondent also cites United States v. Mikutowicz, 2003 WL
21857885 (D.Mass.Aug.6,2003), but failed to attach a copy as
indicated. RM at 11, n.8.

There, Judge Gertner has made it absolutely clear that

> The argument flies in the face of principles of
> statutory construction, and existing case law ... The
> plain language of § 3624(c) places  no curbs on BOP
> discretion as to place of confinement prior to the last
> six months or 10% of confinement.  The provision's pur-
> pose is not to set strict conditions on when the BOP can
> designate a prisoner to community confinement.  The statute
> in fact burdens the BOP with a duty ... It "shall" take
> steps to "assure" that prisoners serve the last 10 percent
> of their prison terms "under conditions that will afford
> the prisoner a reasonable opportunity to adjust and pre-
> pare for prisoner's re-entry into the community."

Monahan at 210-211 (internal citations and footnote omitted,

emphasis in original).  Simply put, § 3624(c) does not limit the

BOP's authority, as provided in § 3624(b), to place Petitioner

in a CCC or on Home Confinement in accordance with the pre-December

2002 policy.  To distort the true meaning of the authority pro-

vided in : 3624(b) by suggesting that it would allow a "convicted

murderer sentenced to life imprisonment to serve his entire sen-

tence in a halfway house," is both inflammatory and deliberately

misleading.  Respondent is well aware that the point system

contained in the BOP's Custody Classification Manual (PS 5100.07)

would directly preclude such a situation.

He then concludes his argument by misinterpreting Reno v.

Koray, 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1955).  There,

Chief Justice Rehnquist left no doubt that CCC placement after

sentencing was considered part of the defendant's term of

imprisonment:

> But this fact does not undercut the remaining distinc-
> tion that exists between all defendants committed to
> the custody of the Attorney General on the one hand, and
> all defendants "released" on bail on the other.  Unlike
> defendants released on bail, defendants who are "detained"
> or "sentenced" always remain subject to the control of the
> Bureau.

Id. at 62-63, 115 S.Ct. 2021 (emphasis in original).

Next, Respondent attempts to suggest that "The Legislative History Supports the BOP's Position." RM at 19-24. Not only does he ignore the meaningful analyses in Iacaboni and Monahan, he even quotes opposition to the Crime Control Act of 1990 suggesting that "The American Public wants dangerous felons in jail, not in therapy programs or home detention."[6] RM at 22. This is, perhaps, the most ludicrous misstatement about the desires and needs of the American Public that one could possibly make. Even the President of the United States, in his State of the Union Address on January 20, 2004, stressed the importance to the Americal Public of being secure in the knowledge that the 600,000 inmates who will be released from prison this year, when the "gates of prison open, the path ahead should lead to a better life." A drug felon who does not receive adequate treatment is doomed to re-offend. An ex-offender who cannot get and hold a job which will allow him to support his family will inevitably return to the life of crime he knows. Every day of over-incarceration exacerbates the problem. "Lengthy prison terms undermine an offender's chances for a meaningful life after prison. They destroy communities and decimate families that are already struggling. ... And from those decimated communities comes more crime."[7]

---

[6]This quote is provided without the identification of the Member of Congress who said it.

[7]"Too Little Second Chances for Prisoners." By Judge Gertner, The Boston Globe, January 25, 2003, p. H11.

In an address before Toastmasters International, Petitioner noted society's four-fold objective in punishing criminals (deter others, prevent recidivism, provide rehabilitation, and exact vengence) and observed, "We have become very good at the last of these, but in the process we have dangerously neglected the other three. As a direct result of this monolithic focus, those millions of criminals mentioned earlier will be returned to us no better prepared to function in society than they were when they originally chose to break the law."[8]

Furthermore, the Respondent's use of a dissenting comment to portray the legislative history of 18 U.S.C. 3624(c) flies in the face of Judge Gertner's opinion in Monahan:

> Of course, the substance of floor debate is still less reliable as an interpretive guide than would be a house report, which itself pales beside unambiguous language. See, e.g., Landgraf v. USI Film Prods., 511 U.S. 244,262 & n. 15, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)(discounting the interpretive value of "frankly partisan statements" made during legislative debate); Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)(observing that floor debate at best gives insight into the understanding of individual legislators. The government's far from comprehensive legislative exegesis of §3621(b) -- accomplished through a selective excavation of the ammendment history of another statute -- invites the comparison that Judge Leventhal of the D.C. Circuit has drawn likening legislative history citations to "looking over a crowd and picking out your friends." Patricia Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983) (paraphrasing Judge Leventhal); see also Conroy v. Aniskoff, 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993)(Scalia,J., concurring in the judgment)(same).

Monahan at 210, n.10.

Following this, Respondent tries to argue that the Administrative Procedure Act does not apply to the December 2002

---

[8]Petitioner's speech before Gavel Club 13 of Toastmasters International, Fall 2003 (full text included as Exhibit 1).

11

policy change. This is clearly not true. Based on a letter
from the U.S. Attorney's office to this Court dated March 20,
2003, the Court concluded that, "This is no mere effort at in-
terpretive guidance but rather a rulemaking exercise designed to
reshape the scope of a statutory provision through an adminis-
trative statement of lawmaking. Such an undertaking requires
notice and comment under 5 U.S.C. § 553, a provision of the
Administrative Procedure Act not included within the limitations
of 18 U.S.C. § 3625 on applicability of the APA to BOP determina-
tions under section 3621. ... But until the government follows
the rules about rulemaking, the Deputy Attorney General's new
rule may not be applied to the defendant." Mallory.

    Respondent's final arguments address the impermissible
retroactive application of the December 2002 policy change to
Petitioner. Notably, he misrepresents the holding in Dominique
v. Weld, 73 F.3d 1156 (1st Cir. 1996), suggesting that the
termination from a work release program did not violate the
Ex Post Facto clause. RM at 28. However, the court in Dominique
noted that it is not a protected liberty interest which would be
an affirmative enforceable right that invokes the Ex Post Facto
clause, but rather whether a right has vested. Id. at 1162, n.9
(citing Weaver v. Graham, 450 U.S. 24, 29-30, 101 S.Ct. 960,
964-65, 67 L.Ed.2d 17 (1981). The Dominique court reasoned that
the transfer "subjected the plaintiff to conditions no different
than those experienced by other prisoners (i.e., the majority of
prisoners who did not participate in work release). However,
prior to the December 2002 policy change, nearly all Federal
inmates were given six months or more CCC placement, thus vesting

12

Petitioner's right to receive the same. Clearly, this "imposes atypical and significant hardship on [Petitioner] in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). See, also, Young v. Harper, 520 U.S. 143, 152-53, 117 S.Ct. 1148, 137 L.Ed.2d 270 (1997)(an Oklahoma "preparole conditional supervision program" was sufficiently like parole to invoke the procedural protections outlined in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).).

Finally, is must be noted that Respondent indicates that he respectfully disagrees with the decisions in Iacaboni, Monahan, and Mallory (RM at 26, n. 23), but the appeal period for the decision in Monahan has long passed, and Respondent did not appeal it.

Conclusion

Two final issues must be addressed. First, the interests of society would best be served by granting Petitioner the relief requested. He and his family have already been punished for his offense. Nothing will be gained by delaying his opportunity to begin providing financial support to them through gainful employment which can only occur with CCC or Home Confinement placement. Several work opportunities already await his transfer.

Second, the entire tone of Respondent's Answer appears to cast responsibility for the incorrect calculation of Petitioner's good conduct time credit and CCC/Home Confinement placement upon the Regional and National BOP officials who have established the

13

offending policies. It should be noted that none of the more than two million prisoners who are currently incarcerated in county, state, and Federal prisons could have successfully raised as a defense, "My boss (supervisor, superior officer, etc.) ordered me to do it." When accused Nazi war criminals at the Nürnberg trials claimed that they were "only following orders," the righteous people of the world refused to accept such an abdication of individual, personal accountability. Surely, the representatives of our own government should be held to no less a standard.

Respectfully submitted,

David Sloane
Petitioner, pro se

I, David Sloane, Petitioner, pro se, certify that the statements made in the foregoing Traverse are true and correct to the best of my knowledge or information and belief and that any false statements made therein are made subject to the penalties of applicable laws relating to unsworn falsifications to authorities.

Executed on the 15 th day of June, 2004.

David Sloane
Petitioner, pro se

## CERTIFICATE OF SERVICE

I, David Sloane, Petitioner, pro se, certify that I have served the above Traverse on counsel for Responsdent by U.S. First Class Mail, postage prepaid, on this date, at the following address: George B. Henderson, II, Assistant U.S. Attorney, U.S. Courthouse, One Courthouse Way, Suite 9200, Boston, MA 02210.

June 15, 2004.

David Sloane
Petitioner, pro se

14

EXHIBIT 1

Humanity Unrecycled

Presented by David E. Sloane

Gavel Club 13, Toastmasters International

Fall, 2003


Be afraid, America.  Be _very_ afraid.  Some of your most
terrifying nightmares will soon become reality.

Within the next ten years, six million criminals will be
invading your communities.  Drug dealers, bank robbers, embezzlers,
sex offenders, thugs, fiends -- the very scum of the Earth.  They
have been gathering for many years, sharing experiences and
techniques, learning from each other, each of them eagerly awaiting
the day they will descend upon you.  Their disdain for law and order
festers within them like a cancer.

Be afraid, America.  Be _very_ afraid.

But understand.

These felons are not the ones planning this invasion.  Sadly,
it is those sworn to protect and defend us who, in their sincere
but misguided dedication to duty, have actually created this ever-
worsening situation.  The criminals of whom I speak are only those
who, within the next ten years, will complete their sentences and
be released from their incarceration in thousands of state and
Federal prisons throughout the country.

As a result of the zealous efforts of our courageous law
enforcement officers, our judicial system continues to pack
convicted offenders into those overcrowded prisons like sardines
in a can with only a token concern for what will happen at the
point in the future when they will be released.  They are, we are
led to believe, being punished for the crimes they have committed.

But who is really being punished?

Society's objective in punishing criminals has four components. It is designed to deter others from committing the same crime, to prevent the offender from repeating his activity (recidivism), to change the offender such that he will become a law-abiding and productive member of the community (rehabilitation), and finally to placate our indignation about the offense (vengence). We have become very good at the last of these, but in the process we have dangerously neglected the other three. As a direct result of this monolithic focus, those millions of criminals mentioned earlier will be returned to us no better prepared to function in society than they were when they originally chose to break the law. In fact, their chances of breaking free of the entrapment of a criminal lifestyle are markedly reduced by the brand they must carry forever.

They, along with their families, friends and neighbors, become the real victims of their mistakes.

Certainly, some of these criminals are beyond redemption. For any of a wide variety of reasons, they lack the understanding, desire or ability to be a part of society. Others are merely good people who acted foolishly, will pay the price for their error, and will leave the system, never to return. The vast majority, however, are at the mercy of our short-sightedness, able to be made into productive citizens, but unlikely to have that happen. They are like shipwrecked sailors, drowning just beyond the reach of would-be rescuers.

This situation cannot -- must not be ignored. The risks of doing so are too great. We must require, we must demand of our

criminal justice system that it take off its blinders, put an end to the unconscionable erosion of our constitutionally guaranteed rights, and return to the complete purpose for which we created and empowered it. Failure to do so can only leave us to drown ourselves in a sea of criminality, vice and degradation.

Be afraid, America. Be very afraid.

But don't be complacent.